UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION

United States of America,          )
                                   )
                Plaintiff,         )
                                   )
        vs.                        )        File No. 4:14-cr-135
                                   )
Terrance C. Jackson,               )
                                   )
                Defendant.         )


TRANSCRIPT OF SUPPRESSION HEARING



Taken at
United States Courthouse
Bismarck, North Dakota
July 1, 2015



BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

<u>APPEARANCES</u>

MR. RICK LEE VOLK
U.S. Attorney's Office
220 E. Rosser Ave
P. O. Box 699
Bismarck, North Dakota 58502-0699

                                    FOR THE UNITED STATES


                - - - - - - - - - -


MS. PENELOPE STRONG
Attorney at Law
2517 Montana Avenue
Billings, Montana 59101

                                    FOR THE DEFENDANT


                - - - - - - - - - -

2

<u>GOVERNMENT WITNESSES</u>

<u>Page No.</u>

<u>Officer Jacob Gadewoltz</u>
   Direct Examination by Mr. Volk          5
   Cross-Examination by Ms. Strong     12

<u>Agent Chad Coulter</u>
   Direct Examination by Mr. Volk     18
   Cross-Examination by Ms. Strong     37

- - - - - - - - - -

<u>DEFENSE WITNESS</u>

<u>Terrance Jackson</u>
   Direct Examination by Ms. Strong     54
   Cross-Examination by Mr. Volk     61

- - - - - - - - - -

Certificate of Court Reporter - Page 71

- - - - - - - - - -

 1                    (The above-entitled matter came before the Court, The

 2      Honorable Daniel L. Hovland, United States District Court

 3      Judge, presiding, commencing at 1:37 p.m., Wednesday, July 1,

 4      2015, in the United States Courthouse, Bismarck, North Dakota.

 5      The following proceedings were had and made of record in open

 6      court with the defendant present.)

 7                    - - - - - - - - - - -

 8                    THE COURT:  We'll open the record in the case of

 9      *United States versus Terrance Jackson*.  Here on behalf of the

10      federal government is Assistant U.S. Attorney Rick Volk.

11      Representing the defendant is Attorney Ms. Strong from

12      Billings.  Welcome to North Dakota.

13                    MS. STRONG:  Thank you, Your Honor.

14                    THE COURT:  Mr. Jackson, how are you?

15                    THE DEFENDANT:  Fine.

16                    THE COURT:  This is scheduled as a suppression

17      hearing.  There was a motion to suppress certain statements

18      filed on March 23, 2015.  The government filed a response to

19      that motion on April 6th.  I've read all the briefs, read all

20      the attachments, read all the cases that were cited by the

21      parties in their briefs.  Any counsel want to make any sort of

22      an opening statement?  If either do, I'll certainly give you

23      that chance.  If you want to start hearing evidence, we'll

24      start with that right away.

25                    MR. VOLK:  I'm just ready to present evidence, Your

                                        4

1    Honor.  I have no opening statement to make.

2            MS. STRONG:  Your Honor, just a very brief opening

3    statement.  This, of course, concerns an interview -- what we

4    deem an interview that FBI Agents Coulter and Bennett had with

5    my client on the late evening hours of March 27, 2014, after he

6    was arrested by tribal officers.  And there is a Miranda issue

7    in terms of whether he needed to be Mirandized for that

8    interview.  The government is asserting he previously had

9    Miranda rights administered by Officer Gadewoltz, who I

10   understand is going to testify.

11           And there's a further issue about the assertion of

12   his right to counsel.  And that, of course, is a little bit

13   different from the Fifth Amendment right, and I imagine the

14   evidence will develop that further.

15           THE COURT:  Very well.  Mr. Volk.

16           MR. VOLK:  United States calls Jacob Gadewoltz, Your

17   Honor.

18                    OFFICER JACOB GADEWOLTZ,

19   having been first duly sworn, was examined and testified as

20   follows:

21                      DIRECT EXAMINATION

22   BY MR. VOLK:

23   **Q.**   Officer Gadewoltz, can you tell the Court your name and

24   with whom you are employed, please?

25   A.    My name is Jacob Gadewoltz.  I'm employed through the

1    Three Affiliated Tribes law enforcement.

2    **Q.**    How long have you been working for the Three Affiliated

3    Tribes law enforcement services?

4    A.    Just under three years.

5    **Q.**    And what are your present duties with that agency?

6    A.    I am now a canine officer, regular patrol, answer service

7    calls on night shift.

8    **Q.**    And have you been engaged in patrol duties since you were

9    employed by the tribal law enforcement services?

10   A.    Yes, sir.

11   **Q.**    And do you patrol the entire reservation, or are you

12   assigned to a specific segment of the reservation?

13   A.    My segment is New Town.  However, we do respond to calls

14   throughout the entire Fort Berthold Reservation.

15   **Q.**    And have you been assigned to the New Town segment since

16   you began working there?

17   A.    Correct.

18   **Q.**    All right.  Officer Gadewoltz, you were employed by the

19   Three Affiliated Tribes law enforcement services back on

20   March 27th of 2014, is that correct?

21   A.    Correct.

22   **Q.**    On that date did you have occasion to become involved in

23   the investigation of a stabbing death of a person by the name

24   of Gerald Smith?

25   A.    Correct.

1    **Q.**   And you were contacted by someone from law enforcement

2    services about responding to that, is that correct?

3    A.   Yes, sir.

4    **Q.**   Were you on or off duty at the time that you were

5    initially contacted?

6    A.   I was off duty.

7    **Q.**   At home?

8    A.   Correct, sleeping.

9    **Q.**   And about what time of the day was it that you were

10   contacted, if you recall?

11   A.   I believe it was about 3:30.

12   **Q.**   And what were you asked to do when you were initially

13   called?

14   A.   We needed to get in our vehicles, suit up and attempt to

15   locate a possible suspect in a homicide.

16   **Q.**   And who was the person or persons that you were asked to

17   start searching for?

18   A.   Specifically Terrance and Donald Jackson.

19   **Q.**   And when you -- I assume you got into uniform and got in

20   your patrol car and responded, is that right?

21   A.   Correct.

22   **Q.**   And can you tell the Court where you initially began your

23   search for these individuals?

24   A.   I drove up to Sand Hill.

25   **Q.**   And why do you drive up to Sand Hill?

7

1   A.   I know there is a family with the last name Jackson that

2   lives in that -- on that street.

3   **Q.**   And you began searching that area?

4   A.   Correct.

5   **Q.**   Ultimately you did not locate anybody in that specific

6   area, is that right?

7   A.   Correct.

8   **Q.**   Eventually that day did you discover Terrance Jackson

9   somewhere?

10  A.   Yes, sir.

11  **Q.**   And where was that at?

12  A.   On the corner of Eagle Drive, in an apartment building,

13  hidden in a closet.

14  **Q.**   And do you recall whose residence this was?

15  A.   I do not.  The homeowners were not present.

16  **Q.**   And can you tell the Court how you ended up arriving at

17  that residence?

18  A.   At one point we were directed to go towards the tribal

19  building.  We made contact with other individuals involved in

20  the call.  Sergeant Dawn White was given information by one of

21  these individuals that our suspect might be in an apartment

22  building on Eagle Drive.  When we went to that residence,

23  that's where we ended up locating him.

24  **Q.**   So you were there with other law enforcement officers?

25  A.   Correct.

8

1   **Q.**   And at some point in time you were granted consent to

2   search that residence, is that correct?

3   A.   Correct.

4   **Q.**   And you indicated that you did locate Mr. Jackson inside

5   that residence?

6   A.   Yes, sir.

7   **Q.**   And just to be clear for the record, this is within the

8   city limits of New Town?

9   A.   Yes, sir.

10   **Q.**   And can you explain to the Court where you located

11   Mr. Jackson within that residence?

12   A.   He was located in a back room.  I believe it was the east

13   room of the apartment, hidden in a closet.

14   **Q.**   Can you describe his physical appearance as you saw him

15   when you located him in the closet?

16   A.   Very distraught.  His head was shaved.  There was still

17   some small long strands of hair sticking out.

18   **Q.**   And did you take him into custody at that time?

19   A.   I did.

20   **Q.**   Do you recall -- what did you do with him after taking him

21   into custody?

22   A.   Advised him that we did have a warrant for his arrest,

23   advised him of his rights under Tribal Code 6, and then we also

24   Mirandized him.

25   **Q.**   And how did you go about advising him of his tribal rights

1  and his Miranda rights?

2  A.   Our tribal rights we're required to read from a card that

3  we keep in our vehicles or on us, and then Mirandize was

4  through memory.

5  Q.   Okay.  And what did you advise him of through the Miranda

6  warning?

7  A.   That he had the right to remain silent.  Anything he said

8  could be used in court against him.  He had the right to an

9  attorney.  If he could not afford one, one would be appointed

10  to him.

11  Q.   And did Mr. Jackson respond in any way?

12  A.   There was just a lot of head nodding and shaking.  There

13  was no verbal understanding.

14  Q.   Did he -- did you question Mr. Jackson at all?

15  A.   No, sir.

16  Q.   Do you recall what time of the day it was when you took

17  Mr. Jackson into custody?

18  A.   It was at 17:13, so it was about 5:13 p.m.

19  Q.   And did you transport Mr. Jackson from the apartment?

20  A.   Yes, sir.

21  Q.   Where did you transport him to?

22  A.   The Gerald Tex Fox Justice Center also in New Town.

23  Q.   And how far away was the justice center from the

24  apartment?

25  A.   It's between three-quarters and one mile.

1    Q.   And what did you do when you arrived at the jail?

2    A.   We had to wait outside of the -- we call it a sally port,

3    the holding area for newly arrived inmates or suspects.  And

4    there was already other individuals being intaked in there, so

5    we parked outside the gate as we could -- as we were waiting.

6    Q.   Okay.  So you just waited outside?

7    A.   Correct.

8    Q.   And Mr. Jackson was still in your patrol car?

9    A.   Yes, sir.

10   Q.   Did you have any conversation with him while you waited to

11   get into the jail?

12   A.   No, sir.

13   Q.   And did you lodge him or book him into the jail?

14   A.   Yes, sir.

15   Q.   And did you assign any tribal charges against Mr. Jackson

16   when he was lodged into the jail?

17   A.   Yes, sir.

18   Q.   What did you lodge him for?

19   A.   I believe you have that sheet, but I believe it was going

20   to be hindering law enforcement, assault and battery, resisting

21   arrest, obstructing public ways or highways.  If there was any

22   other charges, it's going to be on that sheet that you have.

23   Q.   All right.  And that was -- those were charges that you

24   were -- tribal charges, correct?

25   A.   Correct.  Yes, sir.

1    **Q.**   Related to the incident involving Gerald Smith?

2    A.   Correct.

3    **Q.**   From that same day?

4    A.   Yes, sir.

5    **Q.**   Did you have any further contact with Mr. Jackson at all?

6    A.   No, sir.

7          MR. VOLK:  That's all the questions I have for

8    Officer Gadewoltz, Your Honor.

9          THE COURT:  Ms. Strong.

10         MS. STRONG:  Thank you, Your Honor.

11                     CROSS-EXAMINATION

12   BY MS. STRONG:

13   **Q.**   Officer Gadewoltz, you had never met Mr. Jackson before,

14   is that correct?

15   A.   I can't confirm or deny that.  I believe I've had previous

16   contact with him, though.  I'd have to look into our computer

17   system.

18   **Q.**   And you were not the only officer who encountered him in

19   the area of the closet in the apartment on Eagle Drive in New

20   Town that day, were you?

21   A.   Correct.  There was another officer.  There was other

22   officers in the area.

23   **Q.**   Officer Rodriguez was assisting, correct?

24   A.   Yes, ma'am.

25   **Q.**   And when you advised him of his rights under the tribal

1    code, you indicated on direct that you had to read those

2    verbatim, correct, from a card?

3    A.   Correct.  Yes, ma'am.

4    Q.   But when you advised him of Miranda rights, you did it

5    from memory.

6    A.   Correct.

7    Q.   You did not use a written form for the Miranda rights,

8    correct?

9    A.   No, ma'am.

10   Q.   You did not have him sign a form to indicate that he

11   understood the Miranda rights, correct?

12   A.   Correct.

13   Q.   And I believe you also stated that when you located him,

14   you were asked about his physical condition, and you said that

15   he seemed very stressed.

16   A.   Correct.

17   Q.   So are you also referring to the emotional condition of

18   Mr. Jackson on that date?

19   A.   Just in general, health, well-being.  I mean, I can

20   describe a physical description.  He had dark circles around

21   his eyes.  You know, he just seemed in a daze.

22   Q.   All right.  And did you follow your usual procedure when

23   you administered both the tribal code warnings and the Miranda

24   warnings?

25   A.   Yes, ma'am.

1    **Q.**  And that usual procedure does not require a written

2    Miranda warning to be signed by the person that you're

3    administering it.

4    A.   Correct.

5    **Q.**  Then you put him in your car and you transported him to

6    the Gerald Fox Justice Center, correct?

7    A.   Correct.

8    **Q.**  And that just took a few minutes.

9    A.   I'm sorry?

10   **Q.**  That just took a few minutes, correct?

11   A.   Correct.

12   **Q.**  Is there a video of your interaction with him that was

13   taken in your patrol car, Officer?

14   A.   My vehicle did not have a camera system at that time.

15   **Q.**  Did you have any sort of belt camera system or any other

16   recording system on your person?

17   A.   No, ma'am.

18   **Q.**  Is there a reason why your vehicle didn't have a recording

19   system?

20   A.   Our department has not -- did not have them all equipped

21   at that time.

22   **Q.**  But some of the cars are equipped?

23   A.   They are all now.

24   **Q.**  All right.  And you had to wait to book him into the jail,

25   didn't you?

14

1    A.   Correct.

2    Q.   And during that time, are you certain that you didn't have

3    any conversations with my client?

4    A.   Correct.

5    Q.   Is it possible that you asked him about where the knife

6    was?

7    A.   No.

8    Q.   Is it possible that he made some type of statement about,

9    "This isn't all about the warrant?"

10    A.   Not to my knowledge, no.

11    Q.   You're saying you had absolutely no conversation with

12    Terrance Jackson while you were waiting for him to be lodged or

13    booked into the jail.

14    A.   That's my memory, yes.

15    Q.   Were you alone in the car with Mr. Jackson during that

16    time?

17    A.   Yes.

18    Q.   Did he appear to be very tired at that time?

19    A.   He's -- no, ma'am, I wouldn't have been able to really see

20    him.  He's in my backseat behind a metal screen and Plexiglass.

21    Q.   But you indicated when you first saw him, he had dark

22    circles under his eyes?

23    A.   Correct.

24    Q.   Did it -- and his speech was slurred?

25    A.   I never said his speech was slurred.

1  **Q.**  All right.  Was his speech slow, or was that an issue with

2  his speech?

3  A.  I don't remember really speaking with him when we were in

4  my vehicle.

5  **Q.**  All right.  So was your concern to get him under arrest,

6  handcuffed and into your vehicle when you find him in the

7  closet?

8  A.  So that means the matter at hand.  After we obtain a

9  suspect, that's what we do.

10  **Q.**  When -- going back to when you administer the rights, you

11  advised him that there was a federal warrant for his arrest, is

12  that correct?

13  A.  Correct.

14  **Q.**  You didn't advise him -- or did you advise him that he was

15  also under arrest for allegedly stabbing or assaulting Gerald

16  Smith?

17  A.  Not to my memory, no.

18  **Q.**  Had you had any briefing from other officers within the

19  tribal police about encountering Mr. Jackson, whether or not he

20  should be talked to or interviewed?

21  A.  Correct.  I was advised not to question him, just to bring

22  him straight to the justice center, by my supervisor.

23  **Q.**  And is your supervisor Grace Many Horses (sic)?

24  A.  No.

25  **Q.**  Who was that?

1    A.    Bernardo Rodriguez.

2    **Q.**    So they didn't want him interviewed at all.

3    A.    Correct.

4    **Q.**    About how long did you have to wait with him in the car

5    until he was booked in?

6    A.    I believe three to five minutes.

7    **Q.**    Could it have been longer?

8    A.    It could have been.

9              MS. STRONG:  I have nothing further.  Thank you.

10             THE COURT:  Mr. Volk, anything else?

11             MR. VOLK:  I have nothing else for this witness, Your

12    Honor.

13             THE COURT:  All right.  Thank you, sir.  You may step

14    down.

15             MR. VOLK:  Your Honor, I'd ask that the officer be

16    excused.  He's been on duty since last night.

17             MS. STRONG:  No objection, Your Honor.

18             THE COURT:  All right, sir.  You are excused.  You're

19    free to leave.

20             MR. VOLK:  United States calls Chad Coulter, Your

21    Honor.  He's on the video screen.

22             THE CLERK:  Good afternoon, Chad.  It's Judy.  I'll

23    need to swear you in.  Could you raise your right hand, please?

24                        AGENT CHAD COULTER,

25    having been first duly sworn, was examined and testified as

17

1    follows:

2                       DIRECT EXAMINATION

3    BY MR. VOLK:

4    **Q.**   Agent Coulter, this is Rick Volk with the U.S. Attorney's

5    Office.  Are you able to hear me?

6    A.    Yes, sir, I can hear you fine.  Can you hear me okay?

7    **Q.**   Yes, sir.  Could you please state your name and your

8    occupation for the Court, please?

9    A.    My name is Chad Coulter, C-O-U-L-T-E-R.  I'm a special

10   agent with the Federal Bureau of Investigation.

11   **Q.**   How long have you been working for the FBI?

12   A.    Since May of 2002.

13   **Q.**   And where are you presently assigned?

14   A.    The State of Arkansas, Little Rock Division, El Dorado

15   Resident Agency.

16   **Q.**   And how long have you been there?

17   A.    Since August of 2014.

18   **Q.**   Agent Coulter, you were previously assigned to the

19   Bismarck, North Dakota, resident agency, is that correct?

20   A.    Yes, sir, that is correct.

21   **Q.**   And were you working in the Bismarck office back in March

22   of 2014?

23   A.    Yes, sir, I was assigned to Bismarck in March of 2014.

24   **Q.**   And what were your general duties working in the Bismarck

25   office?

                              18

1    A.    I primarily investigated controlled substance violations

2    in Indian land within North Dakota.  And then I also responded

3    to and assisted in the investigations involving violent

4    felonies both at Standing Rock and Fort Berthold Indian

5    Reservations.

6    Q.    Agent Coulter, were you involved in the investigation of

7    the death of Gerald Smith back on March 27th of 2014?

8    A.    Yes, sir, I was.

9    Q.    And you had been involved in other death investigations as

10   you worked with the FBI as well, is that correct?

11   A.    Yes, sir, that's correct.

12   Q.    With reference to the investigation of the death of Gerald

13   Smith, do you recall approximately what time and where you were

14   at the time you were initially contacted about that -- about

15   that matter?

16   A.    On March 27th of 2014, earlier in the day I was in New

17   Town, North Dakota, working on separate investigations with a

18   variety of law enforcement agents.  I had departed New Town and

19   was en route back to Bismarck when I received an e-mail, if I

20   recall, from my supervisor, and that e-mail essentially advised

21   me and others that there was what appeared to be an incident in

22   New Town and an individual was deceased and requested

23   assistance.

24            I don't remember exactly where I got that e-mail, but

25   I want to say that I was somewhere between Washburn and

1    Bismarck, and I turned around and I returned to New Town.  I

2    remember pulling over in Parshall and making one or more phone

3    calls regarding the need to continue to respond, and I agreed

4    to continue on to New Town and meet with the case agent,

5    Special Agent Bruce Bennett with the FBI, and others and help

6    them that evening.

7    **Q.**    Do you recall approximately what time you arrived in New

8    Town for the second time that day.

9    A.    I believe it was at or about 7:00 or 7:15 that evening.

10    **Q.**    And where did you go when you arrived in New Town?

11    A.    I went to the justice center or the police department in

12    New Town.

13    **Q.**    And what did you do when you arrived at the police

14    department?

15    A.    I recall meeting with Special Agent Gerald White, who was

16    a federal agent with the Bureau of Indian Affairs, and Agent

17    Bennett with the FBI, and then maybe one other agent or officer

18    at the police department.

19    **Q.**    And what was the purpose of your meeting?

20    A.    To determine what exactly had happened, what was needed to

21    be done, if there were interviews that could be done.  I

22    understand -- or I understood at the time that there were some

23    law enforcement officers at an apartment, and so we merely

24    wanted to meet with each other and determine how to prioritize

25    what we would do next.

1   **Q.**   And after you met at the tribal police department, where
2   did you next go?
3   A.   Myself, Agent White and Agent Bennett responded to an
4   apartment complex.  I couldn't tell you the name of it or the
5   actual street that it's on.  I understand there are -- at the
6   time I understood that Agent Megan Bennett and a tribal
7   investigator with the Three Affiliated Tribes, Grace Her Many
8   Horses, were both at the jail attempting to conduct some
9   interviews.
10  **Q.**   All right.
11  A.   So Agent Bennett, Agent White and I responded to the
12  apartment.  We met with uniformed officers there, made contact
13  with several people who were in the apartment when the officers
14  arrived on scene, and then the three of us interviewed two
15  women separately in that apartment.
16  **Q.**   And those were Jovonne Fox and Regina Poitra, is that
17  correct?
18  A.   Yes, sir, that's correct.
19  **Q.**   After you had completed those two interviews at the
20  apartment building, did you have occasion to speak with
21  Terrance Jackson that day?
22  A.   Yes, sir, we did.
23  **Q.**   And where did that take place at?
24  A.   At the justice center, the detention center, which is
25  attached to the law enforcement center or the police department

1    there in New Town.

2    **Q.**    And had you ever met Mr. Jackson before, to your

3    knowledge?

4    A.    No, sir.

5    **Q.**    You knew that he was the subject of a federal arrest

6    warrant, is that correct?

7    A.    Yes, sir, that's correct.

8    **Q.**    What was your understanding was the basis for that federal

9    arrest warrant?

10    A.    It was my understanding that he had violated the terms of

11    his supervised release, that he had been convicted and then --

12    but yet had failed to meet the orders by the Court, and,

13    therefore, a federal arrest warrant was issued for his arrest.

14    **Q.**    So that was a post-sentence warrant, is that correct?

15    A.    Yes, sir, that's what I understood it to be.

16    **Q.**    And you had been working in the District of North Dakota

17    for a few years prior to this particular event happening,

18    correct?

19    A.    Yes, sir, that's correct.

20    **Q.**    And you and -- the FBI and the marshal service and other

21    federal agencies have an understanding of who executes the

22    various warrants that are issued out of the District of North

23    Dakota, the United States District Court, is that correct?

24    A.    Yes, sir, that's absolutely correct.

25    **Q.**    And what was your understanding of who was responsible for

22

1    executing that post-conviction or petition warrant?

2    A.   As a case agent that would present cases to your office

3    for prosecution, leading up to their sentence, it was the

4    responsibility of the case agent to affect the arrest if there

5    was a pretrial release violation.  For instance, if a defendant

6    is arraigned in this courtroom and then released with

7    conditions and that defendant violates those conditions and

8    then Your Honor orders an arrest warrant be issued, then our

9    understanding was the United States Marshal would forward a

10   copy of that warrant to me or to my partners to affect that

11   arrest, and that was pretrial release violation type warrants.

12        However, if somebody is convicted and sentenced to a

13   term of federal incarceration and/or supervised release, once

14   that occurs, then it's up to the United States Marshal or

15   whoever they designate to affect the arrest and the

16   transportation of defendants who violate those terms.

17   Q.   So in this particular case with the outstanding warrant

18   for a violation of Mr. Jackson's supervised release conditions,

19   which agency was responsible for executing that warrant?

20   A.   The United States Marshal.

21   Q.   So when you met with Mr. Jackson, was it your intent to

22   take him into federal custody for that past -- or that

23   outstanding arrest warrant?

24   A.   No.

25   Q.   And you indicated that you met with him at the justice

1    center, is that correct?

2    A.    Yes, sir, that's correct.

3    **Q.**    Do you recall approximately what time it was in the day or

4    the night that you met with Mr. Jackson?

5    A.    It was after we had conducted those two interviews at the

6    apartment complex.  And I want to say it was approximately 9:45

7    or just prior to 10:00 p.m. on March the 27th, 2014, that same

8    evening.

9    **Q.**    And where did you actually meet with Mr. Jackson at within

10    that facility?

11    A.    I have interviewed numerous inmates and defendants at that

12    law enforcement center, and routinely, most of the time we

13    would utilize the office of Fred Fox (sic), who at the time was

14    the jail administrator.  His office is directly behind the law

15    enforcement center's intake room, and it is an office.  It has

16    a desk.  It has a restroom attached to it.  And so any time

17    myself, Agent White, Agent Bennett or other investigators would

18    interview people at the jail, we would commonly use Mr. Fox's

19    office.

20    **Q.**    And did you do that with Mr. Jackson on this same day?

21    A.    Yes, sir, we did.

22    **Q.**    How did he get to that office?

23    A.    The three of us, Agent Bennett, Agent White and myself,

24    entered the law enforcement center, made contact with the jail

25    personnel or intake staff, requested that they bring

1    Mr. Jackson to us in an attempt to interview him.  The three of

2    us then, as has always been the case, were provided access to

3    Mr. Fox's office.  Obviously, it's after normal business hours,

4    and so the three of us went into Mr. Fox's office and waited

5    for Mr. Jackson to be escorted there for an attempt at an

6    interview.

7    **Q.**    And somebody brought him over then?

8    A.    Yes, sir, that's correct.

9    **Q.**    And how was Mr. Jackson dressed as he came into the room?

10   A.    If I recall, he had some jail type pants on and a white

11   t-shirt.

12   **Q.**    Was he restrained with handcuffs or leg irons or chains

13   when he was in the room with you?

14   A.    No, sir, not at all.  None of the above.

15   **Q.**    Can you describe the room a little bit for the Judge?

16   A.    Yes, sir.  It's a small office.  Mr. Fox has a

17   standard-sized desk with drawers, and when you enter his

18   office, the desk, if you -- this is very difficult by video, so

19   I'm sorry, Judge.  When you walk into Mr. Fox's office,

20   directly to the left or at your left knee, to the back wall is

21   his desk.  And then the back wall of his office or opposite the

22   door or entryway into his office is built-in shelves with a

23   counter.  And then to my right, if I'm standing in the doorway,

24   are two small adjacent rooms that each have doorways into

25   Mr. Fox's office.  The first room appears to always contain

1    various items like storage, and then the second room or the

2    room in the back right corner if I'm standing in the doorway is

3    a restroom.

4    **Q.**    And are there chairs in the room?

5    A.    Yes, sir.  I believe there were three chairs in the room,

6    and we had to retrieve a fourth chair from the storage room

7    adjacent to Mr. Fox's office.

8    **Q.**    And you had those chairs set up or in the room prior to

9    Mr. Jackson arriving?

10   A.    Yes, sir, that's correct.

11   **Q.**    And can you tell the Judge how -- well, who else was in

12   the room besides you and Mr. Jackson at the time of this

13   interview?

14   A.    Agent Bennett and Agent White.

15   **Q.**    So there's four --

16   A.    Gerald White.

17   **Q.**    Four of you total in the room?

18   A.    Four total once Mr. Jackson arrived, yes, sir.

19   **Q.**    None of the jail staff remained in the room?

20   A.    No, sir, not at all.

21   **Q.**    And can you explain to the Judge where the four of you

22   were seated within this room?

23   A.    I sat at Mr. Fox's desk.  Then to my immediate left but in

24   the back corner was Agent Gerald White.  And then almost

25   directly in front of me or on the back wall was Agent Bennett.

1    And then Mr. Jackson was escorted into the office, and he was

2    seated at the chair closest to the door.

3    **Q.**   So after Mr. Jackson is brought into the room -- well,

4    first, as Mr. Jackson is brought into the room, can you

5    describe his physical appearance to the Judge?

6    **A.**   The best word to describe my feeling about his appearance

7    is exhausted.  He looked sick and exhausted.

8    **Q.**   And can you -- you did start to discuss matters with

9    Mr. Jackson, started to talk to him, correct?

10   **A.**   Yes, sir, we did.

11   **Q.**   And can you explain to the Court how those discussions

12   began?

13   **A.**   As normally in the case of an interview, we identify

14   ourselves.  And I believe Agent Bennett had a copy of the

15   United States Marshal Warrant, and he asked Mr. Jackson if he

16   knew why he was in jail.  Mr. Jackson acknowledged that he

17   understood that there was some type of warrant.  And then I

18   asked him if he would consent to me using sterile swabs to swab

19   the tips of his fingertips.

20   **Q.**   I want to go back just --

21   **A.**   And when I asked him --

22   **Q.**   Hold on one second, Agent Coulter.  Before Agent Bennett

23   showed the warrant to Mr. Jackson, was there some discussion

24   about his background?

25   **A.**   Oh, sure.  You mean as far as like family and an address?

27

1    **Q.**   Correct.

2    A.   Yes.  Yes, he identified his mother as Iris Jackson and

3    that he lived with her on Sanish, which I know to be a

4    community on Sanish Hill west of New Town.  He may have given

5    me his date of birth.  So typically when I interview somebody,

6    Mr. Volk, I ask them some basic information about themselves.

7    **Q.**   And you wrote that down in your notes, correct?

8    A.   I did.  Yes, sir, I did.

9    **Q.**   You were taking notes that -- during the course of that

10   interview?

11   A.   I was.  It was -- it was our agreement that Agent Bennett

12   would be the case agent because he was the first responder and

13   he's assigned to the Minot resident agency.  And I volunteered

14   to take notes in an effort to assist him with some of the

15   interviews that night.

16   **Q.**   And so as Mr. Jackson is providing some of the information

17   to you about his background, you're writing that down in your

18   notes?

19   A.   Yes, sir, that's correct.

20   **Q.**   And you indicated that Mr. Jackson was shown the warrant

21   by Agent Bennett?

22   A.   Yes, sir, that's correct.

23   **Q.**   And did he indicate any awareness or knowledge of that

24   warrant?

25   A.   I think he stated he understood or that he had been shown

1   the warrant or he knew about the warrant, but then he made some

2   statement that he didn't know why he was in jail.

3   **Q.**   Was Mr. Jackson able to identify who his United States

4   probation officer was?

5   A.   Yes, sir, he was.

6   **Q.**   Who did he identify?

7   A.   Fallon Clouse.

8   **Q.**   Did he indicate he was aware where she was assigned or

9   where she worked from?

10   A.   Yes, he -- he advised that she worked out of the Minot

11   office.

12   **Q.**   And I believe you indicated that you asked Mr. Jackson

13   whether he would consent to a swab of his hands.

14   A.   Yes, I did.

15   **Q.**   Why did you do that?

16   A.   Well, we responded to a death investigation, and one of

17   the many things that we might routinely do in a death

18   investigation is attempt to collect DNA from those that may

19   have been involved.  However, I also noted that there was some

20   dried red substance on one or more of his fingernails.

21   **Q.**   And when you asked Mr. Jackson for consent to swab his

22   hands, can you describe to the Court how he reacted verbally

23   and physically to that?

24   A.   Verbally he said he would consent to that or he agreed,

25   but more importantly, if you can see the camera, he -- he

1    shoved both of his hands out to me in an effort to let me swab

2    them from where I was seated, and so his hands were raised and

3    out, extended in my direction.

4    **Q.**    And so the record is clear, where were you seated at with

5    respect to Mr. Jackson?

6    A.    I was seated at Mr. Fox's desk.

7    **Q.**    So was the desk between you and Mr. Jackson?

8    A.    No.  I'm sorry.  So it's hard to describe this room

9    verbally.  I am at Mr. Fox's desk, but I am in his chair,

10    turned around, facing the back of the room.

11    **Q.**    All right.  So there's no furniture between you and

12    Mr. Jackson.

13    A.    Zero.

14    **Q.**    So he's seated in a chair directly in front of you.

15    A.    Yes, sir, that's correct.

16    **Q.**    So you indicated by your action that he lifted his arms up

17    and held them out towards you?

18    A.    Yes, sir, both of them.

19    **Q.**    And what did you do at that point in time?

20    A.    I had three sterile-packaged evidence swabs.  We had

21    obtained some sterile solution from the jail staff.  And then I

22    opened up each of the packages one by one, and then I would put

23    some sterile solution on the swab or the large Q-tip.  And then

24    I would swab each of his fingers and then place those swabs

25    back in the packaging, as is normally the case when you swab

1    someone.  And then those packages are later transported to the

2    North Dakota Attorney General's Office laboratory for

3    examination.

4    **Q.**   And how long did that process take, Agent Coulter?

5    A.    It took several minutes because, again, I'm opening up a

6    package containing a swab.  I am then using a sterile solution

7    to dampen the swab.  I'm then using the swab to swab each of

8    his fingers, put the swab back in its packaging.  And then I

9    usually write on the packaging which fingers were swabbed with

10   that particular swab, if you will.

11   **Q.**   All right.

12   A.    So it took -- it took several minutes.

13   **Q.**   So were you having any discussions with Mr. Jackson while

14   you were doing that or were others?

15   A.    I didn't specifically talk to him about anything.  I

16   recall -- towards the end of that process, I recall Agent

17   Bennett asking him about the events earlier in the evening.

18   **Q.**   And how did Mr. Jackson respond to that?

19   A.    He told Agent Bennett and us in the room that he would

20   rather have an attorney present to talk about that.

21   **Q.**   Okay.  And you -- and you wrote that down in your notes?

22   A.    I did, yes, sir.  Absolutely.

23   **Q.**   Okay.  Were there further discussions with Mr. Jackson

24   after that -- well, strike that.  Up to that point, had any of

25   you in the room advised Mr. Jackson of his Miranda warnings?

1    A.    No, sir, we did not.

2    Q.    And after Mr. Jackson made the comment about an attorney,

3    was there any other discussions or talking with Mr. Jackson?

4    A.    Yes, sir, there were.

5    Q.    Can you explain what went on to the Court?

6    A.    Again, Your Honor, the point I want to make here is that

7    he advised he wanted an attorney about -- in response to the

8    question that Agent Bennett asked him, and so no questions

9    about the incident were asked of him.  But he did utter out the

10   fact that he had been high or up for several days since his

11   birthday.  And then he made a comment about slamming meth, and

12   he used the words -- forgive me -- "fucked up" and "don't

13   remember."

14   Q.    And what did you do at that point?

15   A.    Well, one of the things that we were trying to ascertain

16   and determine is his mental and physical state --

17   Q.    Why were you concerned about that?

18   A.    -- knowing that at some point -- I'm sorry?

19   Q.    Why were you concerned about his mental and physical

20   state?

21   A.    Because, number one, he's in custody.  Number two, if a

22   defendant, whether in tribal custody, federal custody or state

23   custody, is having a reaction to something in his system or has

24   allergies of any kind, then it becomes very cumbersome for law

25   enforcement to then transport said individual to a hospital.

1    And in the back of my mind, at some point in the very near

2    future, presumably the following day on March the 28th, the

3    U.S. Marshal or whomever they designate is going to have to

4    come back and pick him up and transport him to Bismarck.

5           And I've transported a number of inmates from New

6    Town, North Dakota, to Bismarck, and they've been booked with

7    both the U.S. Marshal, and they've been booked overnight at the

8    Burleigh County Detention Center.  And one of the difficult

9    things as law enforcement is organizing and choreographing the

10   transportation of inmates to the point where many weeks while

11   assigned to the Bismarck R.A., somebody is transporting a

12   prisoner every day, and we are responsible for the safety of

13   that prisoner.  And then it also becomes complicated when

14   prisoners have to go to a hospital prior to being transported

15   to Burleigh County or the U.S. Marshal.

16          And so you may ask me more questions, but the thing

17   that I noted in my notes as well is that I asked him about

18   medications and allergies.  I used to work in corrections prior

19   to becoming a police officer and a federal agent, and so I ask

20   a lot of inmates questions about their medical condition

21   because at some point somebody is going to call me at 2 o'clock

22   in the morning and tell me that he needs to go to a hospital or

23   he needs to be transported, and I want to have the best

24   information possible.

25   **Q.**   Can you describe to the Court, Agent Coulter, after you

1    had collected the swabs from Mr. Jackson's hands, how he

2    physically reacted to that, or --

3    A.   Yes, sir.  After -- after he produced his hands in an

4    extended format, his fingers were swabbed.  He makes some

5    utterances of drug use and having not slept since his birthday,

6    which was, I believe, four or five days prior to that

7    interview.  He then pulled his hands back.  He pulled his knees

8    up to his chest, and he was essentially sitting in the chair in

9    a ball with his head down and his hands clutched around his

10   knees up against his chest.

11   **Q.**   And is it during that time that you're having the

12   conversation with Mr. Jackson about his physical health?

13   A.   Absolutely.  No question.

14   **Q.**   Your notes and the report reflect you asked him about the

15   last time he cut his hair, is that correct?

16   A.   To be clear -- yes, my notes and my report reflect a

17   question regarding his hair being cut.

18   **Q.**   Can you explain why that was asked?

19   A.   Yes, sir, I will.  One of the things that we were

20   attempting to do is try to determine if he even knows what that

21   day's date was.  "Mr. Jackson, do you know where you are?  Are

22   you sick?"  One of the things that we noted is his white

23   t-shirt had a substantial amount of hair along the shoulders,

24   and so I recall Agent Bennett asking him something to the

25   effect of, "Do you know when you last cut your hair?"

1   **Q.**   How did he respond?

2   A.   Because it's all over his shirt.  I'm sorry?

3   **Q.**   How did he respond to that question?

4   A.   He said he didn't know.

5   **Q.**   You asked him a question regarding rating his health from

6   one to ten?

7   A.   Yep.

8   **Q.**   Can you explain that to the Court?

9   A.   Absolutely.  Again, it goes back to my history in

10  corrections.  I typically like to ask people who I'm concerned

11  about, for them to rate their state of being on a scale of one

12  to ten; one being I'm going to pass out or I'm so sick I need

13  to go to the hospital, to a ten, which is I'm fantastic, I

14  don't need any kind of medical attention whatsoever.  And he

15  rated himself a three.  And so, again, I'm processing in my

16  head that over the course of the next 24 to 48 hours, law

17  enforcement is going to be responsible about his well-being and

18  transportation to and from the hospital.  And at some point

19  he's going to have to be arraigned on the federal warrant in

20  Bismarck, which is approximately 2 hours and 15 minutes from

21  New Town.

22  **Q.**   Did you ask Mr. Jackson anything regarding the events of

23  that day or regarding the death of Gerald Smith?

24  A.   None whatsoever, zero.

25  **Q.**   How did -- how did this -- how did these discussions with

35

1    Mr. Jackson come to an end?

2    A.    He -- after the statements that he made and then he pulled

3    himself up in a ball and I asked him about his medical

4    condition, he then talked about the revocation warrant.  And at

5    that point he then said he wanted an attorney regarding the

6    matter involving the revocation warrant, so, in effect, he

7    asked for an attorney about the incident that occurred early in

8    the evening, and then at the end he asked about -- or he

9    requested to have an attorney present.  He didn't want to talk

10   about the revocation warrant.

11   Q.    All right.  And did you talk to him any further?

12   A.    None whatsoever.

13   Q.    How did Mr. Jackson end up leaving the room?

14   A.    I believe one of us got up out of our chair and went to

15   request the assistance of a detention officer, who then came

16   and escorted Mr. Jackson from the office.

17   Q.    And did you or others from -- that were in the room have

18   any discussions with corrections staff about Mr. Jackson's

19   health at all?

20   A.    I'm sure we had some conversation about it, yes.  I don't

21   remember specifically who I talked to.  There were a number of

22   correctional officers working that evening.

23   Q.    You did not transport Mr. Jackson to the federal

24   courthouse that evening?

25   A.    No, sir, I did not.  It was my understanding that he was

36

1    going to be detained at the Gerald Fox Detention Center until

2    the following day, when either the U.S. Marshal or their

3    designee would come and transport him back to Bismarck.

4    **Q.**   And you didn't do any of that transport the next day

5    either, is that correct?

6    A.   No, sir, I did not.

7         MR. VOLK:  All right.  That's all the questions I

8    have for Agent Coulter, Your Honor.

9         THE COURT:  Ms. Strong.

10        MS. STRONG:  Your Honor, if it please the Court, I'm

11   going to remain seated at counsel table.

12        THE COURT:  That's fine.

13                     CROSS-EXAMINATION

14   BY MS. STRONG:

15   **Q.**   Agent Coulter, when you interview a suspect and you have

16   them Mirandized and you're taking what amounts to a confession

17   or admission, was it your practice at this time in 2014 to tape

18   record that person?

19   A.   In 2014, no.

20   **Q.**   But the FBI does tape record confessions from time to

21   time, correct?

22   A.   Yes, ma'am, that's correct.

23   **Q.**   And there was a recent change in policy --

24   A.   Our policy -- yes, our policy has changed since 2014.

25   **Q.**   All right.  And prior to 2014, I've seen cases where in

1   homicide investigations, the primary suspect was interviewed.

2   Would that be consistent with your experience?

3           THE COURT:  The primary suspect was interviewed or

4   tape recorded or --

5   **Q.**   (MS. STRONG CONTINUING)  When the primary suspect -- prior

6   to 2014, when the FBI was interviewing the primary suspect in a

7   homicide case, would it be consistent to say that those people

8   would be recorded?

9   A.   No, not in my experience.  No, ma'am.

10  **Q.**   All right.  But you could have recorded Mr. Jackson on

11  that date, correct?

12  A.   Sure.  Yes, ma'am.

13  **Q.**   And you didn't.

14  A.   No, ma'am, we did not.

15  **Q.**   Is there a video facility at the Gerald Fox Justice Center

16  where you folks were with him where you could have videotaped

17  the interview with him?

18  A.   I don't believe so.  I've interviewed people at the Gerald

19  Fox Justice Center for almost four years, and not at any point

20  were we ever afforded a room with a video capability.

21  **Q.**   Well, the goal was to interview him that evening, wasn't

22  it?

23  A.   Well, the primary goal was to see if he would consent to

24  the swabbing of his fingers.

25  **Q.**   Well, Megan Bennett had requested of a number of tribal

38

1    officers not to interview him and to wait until you folks in

2    the FBI arrived.  Is that consistent with your understanding of

3    what the arrangement was?

4    A.    Ma'am, I'm not trying to be hostile.  I don't know her

5    exact conversations with the tribal investigators or law

6    enforcement.  I know that he wasn't interviewed, and we went to

7    the jail in an effort to swab his fingers and then see if he

8    would talk to us.

9    **Q.**    Well, you met with Bruce Bennett prior to having the

10   encounter with Mr. Jackson, didn't you?

11   A.    Yes, I did.

12   **Q.**    And did you meet with Megan Bennett also?

13   A.    Not at the police department.  She came to the apartment.

14   She arrived during the middle of one of the interviews that I

15   was conducting with either Ms. Poitra or the other woman.  And

16   so I saw Agent Megan Bennett come into the apartment, and there

17   were other people that needed to be interviewed, and she left

18   the apartment and interviewed somebody outside.

19   **Q.**    All right.  So you're saying that the primary purpose of

20   the encounter with Mr. Jackson, your understanding of what you

21   and Agent Bennett and Gerald White were there to do was just to

22   get the swabs, correct?

23   A.    No, I didn't say just to get the swabs.  To swab his

24   fingers and see if he would talk to us.

25   **Q.**    All right.  So you were there for an interview regarding

1    the Gerald Smith stabbing, weren't you?

2    A.    We were there to attempt to swab his fingers and see if he

3    would talk to us.  Again, I don't -- I don't pretend to believe

4    that people are going to talk to me.  It's an effort to see if

5    he would.

6    Q.    All right.  And at the outset, who would you say was the

7    lead agent in terms of interaction with Mr. Jackson,

8    Mr. Bennett or yourself or both of you?

9    A.    At the onset, Mr. Bennett.  And then I was the primary one

10   responsible for swabbing his fingers.

11   Q.    All right.  And Agent Bennett -- first of all, let's

12   establish it was very clear my client was in custody and under

13   arrest, correct?

14   A.    That's correct, yes, ma'am.

15   Q.    He wasn't going anywhere, was he?

16   A.    No, ma'am, he wasn't.

17   Q.    And you know through your extensive law enforcement

18   training that when a person is in custody and they are to be

19   interviewed, they have to be administered Miranda warnings,

20   correct?

21   A.    Well, I know that --

22   Q.    Yes or no?

23   A.    -- there are a number of -- you're going to have to

24   rephrase the question because I can't give you a yes or no.

25   Q.    All right.  If a person is in the custody of law

1   enforcement and any law enforcement officer, including someone

2   like yourself from the FBI, seeks their formal interview, yes

3   or no, isn't it true that they must administer Miranda

4   warnings?

5   A.   Not always.

6   Q.   All right.  Agent Bennett did not administer any Miranda

7   warnings that day, did he?

8   A.   No, he did not.  No, ma'am.

9   Q.   And you did not either.

10  A.   That's correct, I did not.

11  Q.   And there apparently was no discussion between yourself

12  and Agent Bennett or Megan Bennett, who was also working on the

13  case, about whether Miranda warnings would be administered to

14  Mr. Jackson prior to going into the room.

15  A.   Again, I can't speak to what Agent Megan Bennett may have

16  discussed with other officers.  I was with Agent Bruce Bennett

17  from the apartment to the law enforcement center, and we did

18  not discuss Miranda, correct.

19  Q.   All right.  And Agent Bennett was not there to serve the

20  probation violation warrant.  That had already been done,

21  correct?

22  A.   I don't know if I could testify to the word "serve."  I

23  don't -- I don't know who produced the warrant for Mr. Jackson.

24  I don't know how he got to the law enforcement center.  I know

25  that Bruce Bennett showed him a copy of that warrant, and

1    Mr. Jackson acknowledged that he had seen a copy of that

2    warrant earlier that evening when he was incarcerated.

3    **Q.**    So you don't know if an officer who had a prior encounter

4    with my client actually served the PV federal warrant on him.

5    Is that what you're telling us?

6    A.    Yes, ma'am, that's correct.  I simply don't know.

7    **Q.**    So you didn't talk to an Officer Gadewoltz about his

8    investigation in this case.

9    A.    Me personally?

10    **Q.**    Right.

11    A.    I talked to a number of officers that night.  I couldn't

12    tell you exactly which officers I talked to.  It's very

13    possible that we communicated, but I don't recall a specific

14    conversation.

15    **Q.**    And to be more specific, do you recall talking to Officer

16    Gadewoltz before you encountered Terrance Jackson that evening?

17    A.    I don't recall, ma'am.  I'm telling you there was a number

18    of officers that I had brief conversations with as I'm moving

19    from one spot to the next.  It's very possible.  I'm not going

20    to deny that it didn't happen, but I can't say for certain.

21    **Q.**    All right.  And you took the notes that evening, correct?

22    A.    I did for our contact with Mr. Jackson, yes, ma'am.

23    **Q.**    Your notes are obviously not a verbatim transcript of

24    everything that was said, correct?

25    A.    That's correct, yes, ma'am.

1   **Q.**   Your notes do reflect on the first page, a statement, "I'd

2   rather have an attorney present," correct?

3   A.   Right.  That was in response to Agent Bennett's question

4   about discussing what happened earlier that night.

5   **Q.**   And that occurred before or after you got the verbal

6   consent and swabbed my client's fingers?

7   A.   That was after.

8   **Q.**   All right.  And then at the end of the interview he, once

9   again, asserted that he wanted his attorney present.

10   A.   For the arrest warrant, which was a separate matter.

11   **Q.**   And you're saying that was for the arrest warrant.

12   A.   Yes, ma'am, I am.

13   **Q.**   Okay.  And the verbal consent and the swabbing of the

14   fingers occurred before all of the questions about his health,

15   didn't it?

16   A.   Yes, it did.

17   **Q.**   You would agree, wouldn't you, Agent Coulter, that when

18   you take a verbal consent from a suspect, it's very similar to

19   administering Miranda warnings in that you're advising a person

20   of the possible relinquishment of a Constitutional right,

21   correct?

22   A.   I would -- would you rephrase the question?  I would agree

23   to what now?

24   **Q.**   Well, let me break it up a little bit.  That may be

25   confusing.  When you take a verbal consent from someone or a

1   written consent to search or take swabs, as you did here,

2   you're asking that person to give up their Fourth Amendment

3   right to have the search done via a warrant, correct?

4   A.   Yes, ma'am, I am.

5   **Q.**   When you administer Miranda rights and you ask a person to

6   waive their Fifth Amendment rights, you are also asking them to

7   give up a Constitutional right that is not to incriminate

8   themselves.

9   A.   That's also correct, yes, ma'am.

10  **Q.**   And it's important, isn't it, when you ask for those type

11  of waivers of Constitutional rights, to ensure that the person

12  is competent to waive the rights?

13  A.   Well, I'm not a medical doctor, but we make an effort to

14  determine if they're capable of answering that question yes or

15  no.

16  **Q.**   And apparently during this interlude with my client, you

17  had -- you evince a concern about his health, right?

18  A.   Yes, ma'am.

19  **Q.**   And that could affect whether or not his giving the

20  consent was voluntary, correct?

21  A.   Well, the questions regarding his health were spurned by

22  some of the statements that he made, and those statements that

23  he made were made on his own -- on his own accord.  He

24  voluntarily responded or voluntarily blurted out the fact that

25  he had been up for several days since his birthday and that he

44

1    had been high on meth and that he slammed drugs into his body,

2    so that was the triggering point.  At the beginning of the

3    interview he told me his name, he told me his mother's name and

4    that he lived with his mom, and so we were having dialogue.

5    **Q.**  All right.

6    A.    But then when he talks about his drug use and being up for

7    five days, now we have somebody that is now opening up to what

8    may or may not be in his system, which now becomes an issue if

9    he's being incarcerated anywhere.

10   **Q.**  Well, the questions about the haircut really don't have

11   anything to do with whether he understands the questions you're

12   asking him, do they?

13   A.    The question about the haircut could go to whether or not

14   he recalls when he last had a haircut, which would go to his

15   state of mind, and I think that could be subjective.  Your

16   opinion or belief of that nature of the question might be

17   different than mine or another person's.

18   **Q.**  The question of the haircut was also relevant to his

19   appearance at the time that he allegedly stabbed Gerald Smith,

20   because he had a -- because the suspect had a long ponytail,

21   correct?

22   A.    Are you -- when you make a statement and you say

23   "correct," are you -- what question are you asking me?

24   **Q.**  I'm asking if you knew if it was an important fact in this

25   stabbing investigation, whether the suspect had -- was reported

45

1    to have a long ponytail.

2    A.    Ma'am, it's a death investigation, and I don't want to

3    appear to be hostile.  Every question is important.  I've been

4    in law enforcement for 20 years.  I've been involved in death

5    investigations.  Every single thing that we did that night was

6    super important.

7    Q.    All right.  Exactly.  So that question was very important

8    when Agent Bennett asked it of Mr. Jackson, correct?

9    A.    Well, you would have to ask Agent Bennett to his mindset

10   and the level of importance in his head.  I can't speak to what

11   Agent Bennett was thinking at the time.  I heard him ask the

12   question, and then I wrote it down.

13   Q.    When you were back at the apartment complex, did you hear

14   anything about hair being found in the complex, recently cut

15   hair?

16   A.    There may have been some conversation about recently cut

17   hair, yes, ma'am.

18   Q.    In what context?

19   A.    I don't -- what do you mean, "in what context"?

20   Q.    Can you be more specific about what you were told about

21   recently cut hair and whose it might have been?

22   A.    He may have had his hair cut that evening at that

23   apartment, and I can't tell you who told me that.  Again, I'm

24   talking to a number of different people.

25   Q.    All right.

46

1  A.   And so there were a variety of stories, information,

2  factual stuff that was being stated, but I couldn't tell you

3  the source of that information.

4  Q.   And there were three officers and just Mr. Jackson alone

5  when this interview occurred, correct?

6  A.   Yes, ma'am, that's correct.

7  Q.   And the other officer, Mr. White, was there for what

8  purpose?

9  A.   Because he was my partner of four years with the BIA.

10  Q.   Was there other evidence taken at this time?

11  A.   Inside that office?

12  Q.   Right.

13  A.   No, not that I'm aware of, no.

14  Q.   And did you have access to the booking information about

15  Mr. Jackson that indicated the relevant questions about how his

16  health was and whether he was suicidal and those type of

17  things?

18  A.   I didn't have access to their computers, no.

19  Q.   So if the booking sheet that the government has submitted

20  indicates that he was not -- did not appear to be highly

21  intoxicated, would you agree that that would be accurate, if

22  the officer correctly recorded that information?

23  A.   I can't speak to a document that you're holding that I

24  can't see, so in fairness, I'm going to take your word for it.

25  If the officer wrote down that that officer did not feel like

47

1    Mr. Jackson was under the influence of alcohol, then I'll have

2    to take the document for what it's worth, but I wasn't a party

3    to that.

4    **Q.**   All right.  And no -- as far as you know, no tests, no

5    blood draws or anything were ordered of Mr. Jackson to verify

6    any drug use by him on or about or before March 27, 2014,

7    correct?

8    **A.**   I don't know anything about any drug test, no, ma'am.

9    **Q.**   And going to the concern that you had about his health, is

10   there some reason why you made the inquiries instead of calling

11   a detention officer to check into his health?

12   **A.**   Well, because at some point, either later that evening or

13   early in the morning, the U.S. Marshal or they may request our

14   assistance in transporting him.  It could be a scenario that

15   would involve us.

16   **Q.**   But the detention --

17   **A.**   So, obviously, the -- I'm sorry.  Go ahead.

18   **Q.**   No, that's -- are you done with your answer?

19   **A.**   Yes, ma'am.  Go ahead.

20   **Q.**   All right.  The detention staff had the main

21   responsibility to ensure his health and welfare while he's in

22   custody with them, don't they?

23   **A.**   That's correct.

24   **Q.**   And they would determine if he needed hospitalization and

25   could not be transported for court, correct?

48

1    A.    Historically in New Town, when individuals complain of

2    pain or request medical attention, those inmates are

3    transported to Minot, North Dakota, to a hospital.  And

4    routinely law enforcement in New Town does not have enough

5    personnel to sit and stay with those that are transported to

6    the hospital.  And so on a number of occasions I've personally

7    been involved in scenarios where people are in custody in New

8    Town, complain of or show signs of some medical situation,

9    they're transported to Minot, and they're left at the hospital.

10            I'm not pointing blame, but then it becomes very

11   complicated for law enforcement who is attempting to move an

12   inmate from one detention center to another, when a hospital is

13   involved and then they are now gone from that hospital.  I've

14   personally driven all the way from Bismarck to New Town to pick

15   up an inmate.  That inmate had been transported to Minot and

16   subsequently released from custody because the hospital needed

17   to do some tests or a checkup of that inmate.

18   Q.    It's true, isn't it --

19   A.    The law enforcement personnel had to return to New Town

20   and, thus, the inmate was left alone at a hospital, and then as

21   you can imagine, that inmate is now not in custody.

22   Q.    Well, that wouldn't have happened here because the U.S.

23   Marshal would have made sure that he remained in custody for

24   the further processing of the PV case, correct?

25   A.    No, that's not necessarily true, ma'am.  Again, going on

49

1    your initial question, the New Town law enforcement center

2    would be responsible for his health and well-being that

3    evening.  And if, 30 minutes after the interview was over with,

4    Mr. Jackson went into cardiac arrest, he would be transported

5    to Minot.  And then halfway to Bismarck or later in the evening

6    we may get another call to come back because somebody that we

7    just interviewed is now complaining of a medical condition,

8    transported to a hospital, isn't now accounted for or is having

9    medical complications, and so that all is pertinent to the

10   several questions that I asked him.

11   **Q.**   Do you know if there ever are video appearances that are

12   done for folks who are in federal custody, but need to make a

13   federal court appearance here in the Bismarck or in the Minot

14   area, if you know?

15   A.    I'm sorry.  If there are -- if defendants appear by video

16   via Minot in a Bismarck federal courtroom?

17   **Q.**   Right.

18   A.    Yes.

19   **Q.**   So there isn't always a need to transport all the way to

20   Bismarck, is there, for the federal court appearance?

21   A.    It's up to the marshal and where they have bed space at a

22   detention center.  That's merely the issue.

23   **Q.**   Going back to your notes and the report that you made --

24   and by the way, you did do a report, and you wrote that on

25   April 6th of 2014, correct?

1    A.    Yes, ma'am, that's correct.

2    Q.    And I don't see the -- you didn't state in here that

3    Terrance Jackson volunteered the information about the drug

4    use.

5    A.    When you say "volunteered," that's -- we could choose 20

6    different words to describe volunteer.  He advised.  He stated.

7    He volunteered.  I didn't pull those words out of his mouth.

8    Q.    All right.  And you also state that throughout the

9    interview, he sat with his arms folded and bent over to the

10   point where his head almost touched his lap.  Do you recall

11   that description from your report?

12   A.    Oh, yes, ma'am, I do.

13   Q.    And that's a pretty detailed description of his physical

14   actions on that date and at that time, isn't it?

15   A.    Yes, ma'am.

16   Q.    And I assume that because you said "throughout the

17   interview," you're talking about the entire interview, that he

18   sat in that manner as you described it in your report.

19   A.    No, I don't know that that's a fair and accurate

20   statement.  I mean, he walked into the interview and he sat

21   down.  I can't tell you -- did he ever uncross his arms?  Yeah,

22   he did because he reached out both his hands when I swabbed his

23   fingers, so I can't testify that it -- he sat like that through

24   the entire interview because that's not true.

25   Q.    All right.  And you don't describe the reaching out of the

1    hands in either your notes or your report, do you, Agent

2    Coulter?

3    A.    Again, as you said earlier in your questioning, notes are

4    summaries.  The report is a summary.  It doesn't have every

5    single fact in it, as do probable cause affidavits.

6    **Q.**    Is there a reason why a written consent to swab his

7    fingers and his hands was not taken from Mr. Jackson on that

8    date?

9    A.    I had two officers present in the room that witnessed me

10    asking him and his response.  That's three separate law

11    enforcement officers, and they're not all employed by the FBI.

12    **Q.**    And when you asked him for a consent to search, is that

13    what you said, "Will you consent to a search and a swabbing of

14    your fingers and your hands, Mr. Jackson?"

15    A.    I probably didn't use the word "search."  I probably said,

16    "Would you allow me to swab your fingers?"  And he reached out

17    his hands and both verbally and with body language consented.

18    **Q.**    And then you swabbed his fingers.

19    A.    Yes.

20    **Q.**    So you didn't advise him that he had a right to refuse

21    that search, did you then?

22    A.    I asked him if he would allow me to do it, and he said he

23    would.  That's what happened.

24    **Q.**    Again, you didn't ask him if he had a right to refuse that

25    search, did you?

1    A.   I didn't ask him if he had a right?  No, ma'am.  I --

2    again, I've answered this multiple times.  I asked him if he

3    would allow me to search his fingers -- or swab his fingers,

4    and he said he wouldn't mind, he would allow me to do that, and

5    then that's what I did.

6            MS. STRONG:  I have nothing further for Agent

7    Coulter.

8            THE COURT:  Mr. Volk, anything else?

9            MR. VOLK:  No, Your Honor.

10           THE COURT:  All right.  Thank you, sir.  You are --

11   any reason he can't be excused?

12           MR. VOLK:  That's fine, Your Honor.

13           THE COURT:  Ms. Strong, any objection to him being

14   excused from these proceedings?

15           MS. STRONG:  No, Your Honor.

16           THE COURT:  All right.  Agent Coulter, you are

17   excused from these proceedings for the day.  Thank you.

18           THE WITNESS:  Judge, thank you, sir.

19           MR. VOLK:  We have no other witnesses then, Your

20   Honor.  We would rest.

21           THE COURT:  All right.  Ms. Strong, do have any

22   witnesses that you intend to present?

23           MS. STRONG:  I do.  I'm going to call my client, Your

24   Honor.

25           THE COURT:  Well, we're going to take a break then.

1    We'll take about a -- we'll recess until 3:15, and then we'll

2    reconvene with the testimony.  And you have how many witnesses,

3    ma'am?

4              MS. STRONG:  I just have my client, and it should be

5    brief testimony.

6              THE COURT:  All right.  Then we'll reconvene at 3:15.

7              (A recess was taken from 2:55 p.m. to 3:17 p.m., the

8    same day.)

9              THE COURT:  We are back on the record in the case of

10   *United States versus Terrance Jackson*.  Ms. Strong, you had a

11   witness you wished to call.

12             MS. STRONG:  Yes, Your Honor.  I'd like to call my

13   client, Mr. Jackson.

14             THE COURT:  All right.  Mr. Jackson, I think we'll

15   just have you sworn in first.  And then I'll let you just

16   question him from there.  We don't have to have him --

17             MS. STRONG:  You'll stay here, Mr. Jackson, but you

18   need to stand up and be sworn in.

19                       TERRANCE C. JACKSON,

20   having been first duly sworn, was examined and testified as

21   follows:

22                       DIRECT EXAMINATION

23   BY MS. STRONG:

24   **Q.**   Would you state your name for the record, please?

25   A.   Terrance Jackson.

1   **Q.**   Mr. Jackson, how old are you?

2   A.   Twenty-four.

3   **Q.**   Are you the defendant in this case?

4   A.   Yes.

5   **Q.**   I want to direct your attention to March 27, 2014.  Do you

6   recall when and where you were arrested on that date?

7   A.   Yes.

8   **Q.**   And do you recall the officer who arrested you?

9   A.   Yes.

10  **Q.**   And you've heard that officer testify in court here today

11  earlier, correct?

12  A.   Yes.

13  **Q.**   I want to direct your attention to when he took you to the

14  Gerald Fox Justice Center to book you in.  What's your

15  recollection of how long you remained in the car with him

16  before you were booked or lodged into the jail?

17  A.   For about 45 minutes to an hour.

18  **Q.**   And where did he hold you at that time?

19  A.   In front of the sally port in his car.

20  **Q.**   In his car.  Was there anyone else other than you and he

21  in his squad car?

22  A.   Neal Hale's son approached the vehicle and spoke to the

23  officer.

24  **Q.**   All right.  And who is Mr. Hale relative to the alleged

25  incident here?

1    A.   Excuse me?

2    **Q.**   Was Mr. Hale a witness?

3    A.   Yes, ma'am.

4    **Q.**   All right.  And did the officer have a conversation with

5    you while he had you in his squad car?

6    A.   Yes.

7    **Q.**   And could you briefly tell the Judge what he asked you

8    about?

9    A.   I said, "All this for a warrant?"  And he said, "This

10   ain't for a warrant.  This is for murder."  And he kept asking

11   me where the knife was.

12   **Q.**   And did you respond to him?

13   A.   No.

14   **Q.**   After you were booked into the jail later that evening on

15   March 27th, did officers request to meet with you?

16   A.   Yes.

17   **Q.**   And where did they take you?

18   A.   Into an office.

19   **Q.**   And how many officers were there to meet with you?

20   A.   Three.

21   **Q.**   And did you know any of those officers?

22   A.   No.

23   **Q.**   Did they identify themselves to you?

24   A.   Yes.

25   **Q.**   And did the one officer -- FBI Agent Coulter, was it he

1    who testified previously today?

2    A.   Yes.

3    Q.   What was -- who was the first officer that spoke to you on

4    that date, and what did they say to you?

5    A.   I believe it was Detective Bennett.

6    Q.   And what did he talk to you about at first?

7    A.   The warrant.

8    Q.   And when you refer to "the warrant," can you be more

9    specific?

10   A.   Probation violation warrant.

11   Q.   And did he serve the warrant on you?

12   A.   He told me I had one.

13   Q.   And what did you tell him?

14   A.   I said, "I'd rather have an attorney present."

15   Q.   All right.  And after that occurred, did the agents

16   question you further?

17   A.   Yes.

18   Q.   And who questioned you, and what was that about?

19   A.   It was Agent Coulter.

20   Q.   And what did he ask you about?

21   A.   About my health.

22   Q.   And can -- can you be more specific about the type of

23   question he asked you about your health?

24   A.   He asked me to rate it from one to -- zero to ten.

25   Q.   Now, at the time that he asked you that, were you seated

1    in a particular position?

2    A.    Yeah, I had my arms crossed and looked -- just looking at

3    my legs.

4    **Q.**    Was there a reason that you were seated in that position?

5    A.    I was stressed out.

6    **Q.**    Okay.  And after he asked you the question on rating your

7    health, were there other questions about your health and how

8    you felt?

9    A.    Yes.

10    **Q.**    Who asked those?

11    A.    Agent Coulter.

12    **Q.**    And can you tell the Court the specific questions you were

13    asked?

14    A.    He asked what kind of drugs I had been doing and how long

15    I'd been up.

16    **Q.**    All right.  And did you respond to those questions?

17    A.    Yes.

18    **Q.**    And were there any more questions about drug use at all?

19    A.    No.

20    **Q.**    After that series of questions, what did the agents talk

21    about or ask you about?

22    A.    Excuse me.  He did -- he asked me how I used it.

23    **Q.**    All right.  And when you mean -- when you refer to "he,"

24    which agent are you referring to, Mr. Jackson?

25    A.    Agent Coulter.

1    **Q.**   And did you respond to that question?

2    A.   Yes.

3    **Q.**   All right.  So after that series of questions about your

4    health and your drug use, what did they ask you about next?

5    A.   They asked me about -- they asked me about the events that

6    happened earlier that day.

7    **Q.**   All right.  But before they asked you about that, did they

8    ask you about giving a consent?

9    A.   No.

10   **Q.**   Okay.  So what did they -- who asked you about the events

11   earlier that day?

12   A.   Agent Coulter.

13   **Q.**   And what did you tell him?

14   A.   I'd rather have an attorney present.

15   **Q.**   All right.  And what was the next conversation that the

16   agents had with you?

17   A.   That they -- about the events that happened earlier that

18   day.

19   **Q.**   Okay.  And was there a conversation about you giving

20   consent to have your hands swabbed?

21   A.   Yes.

22   **Q.**   And who asked you about that?

23   A.   Agent Coulter.

24   **Q.**   And did you agree to have your hands swabbed?

25   A.   Yes.

1  **Q.**   And how did you indicate to Agent Coulter that you would

2  agree to do that?

3  A.   I nodded my head.

4  **Q.**   All right.  Did you do anything else?

5  A.   No.

6  **Q.**   What did he instruct you to do after you nodded your head?

7  A.   To show me -- show him my hands.

8  **Q.**   And did you do that?

9  A.   Yes.

10  **Q.**   All right.  At the end of the interaction or the interview

11  with the agents, did Agent Bennett or Agent Coulter ask to

12  interview you about the events of the day one more time?

13  A.   Yes.

14  **Q.**   And which agent was it who asked you that, if you

15  remember?

16  A.   Agent Coulter.

17  **Q.**   And what did you tell him?

18  A.   I'd rather have an attorney present.

19  **Q.**   Did you say anything about your arrest warrant at that

20  time?

21  A.   No.

22         MS. STRONG:  I have nothing further for Mr. Jackson,

23  Your Honor.

24         THE COURT:  Mr. Volk.

25     ///

1                    CROSS-EXAMINATION

2     BY MR. VOLK:

3     **Q.**   Mr. Jackson, if I understand your testimony correctly, you

4     are indicating that you told the agents three different times

5     that you wanted an attorney present?

6     A.   No, sir, two.

7     **Q.**   Okay.  The first time was right after being shown the

8     warrant?

9     A.   Yes.

10    **Q.**   What precisely did you say?

11    A.   I'd rather have an attorney present.

12    **Q.**   That's it?

13    A.   Yes, sir.

14    **Q.**   Not for that warrant?

15    A.   Yes, sir.  No, sir, just I'd rather have an attorney

16    present.

17    **Q.**   And the second time that you said that you would rather

18    have an attorney present was when?

19    A.   When he asked me about the events that happened earlier

20    that day.

21    **Q.**   And was that before or after you were requested to consent

22    to search of your hands -- swabbing of your hands?

23    A.   That was after.

24    **Q.**   Okay.  Had you used drugs that day?

25                    MS. STRONG:  Your Honor, I'm going to object.  I

1    think my client has a right to -- a Fifth Amendment right not

2    to incriminate himself with regard to that particular question.

3    That is distinct from what he told the agents on that date, and

4    we're going to --

5            THE COURT:  Did you not open the door by asking

6    whether he had been asked about drugs he had been doing, and he

7    answered the question, said that he had responded?

8            MS. STRONG:  With all due respect, I don't think so,

9    Your Honor.  It's a different set of questions, what he told

10   the agents on that date versus the government now asking did he

11   do drugs on that day.

12           MR. VOLK:  Your Honor, it goes to Mr. Jackson's

13   ability to perceive and accurately report the events of that

14   night -- or of that interview, specifically.  If he had used

15   drugs and was having the effects of drugs in his system, that

16   goes directly towards his ability to perceive and report, so

17   it's certainly relevant.  And if he is invoking his right to

18   remain silent, I would ask that all of his testimony be

19   stricken.

20           THE COURT:  Ms. Strong.

21           MS. STRONG:  Your Honor, I believe under *U.S. versus*

22   *Simpson*, an individual such as my client who is doing a

23   suppression motion can testify without fear of incriminating

24   themselves, but I believe that he -- I mean, it's a tricky

25   thing because he could be prosecuted for further drug use.  It

1    is a critical evidentiary issue in this case, and he is going

2    to assert his Fifth Amendment right, but I don't think that

3    it's appropriate for the Court to strike all of his testimony

4    in that regard, and if we need to do some briefing on the

5    *Simpson* issue, I would be glad to do that.

6         But he and I -- that's going to be our position on

7    his answering the question about drug use on that date.  What

8    he told the officers, the agents on that date is different from

9    did he actually use drugs.  Of course, it may be relevant, but

10   he still can assert a Fifth Amendment right not to incriminate

11   himself.  It's a -- it pertains to something that would

12   definitely incriminate him both in this case and a potential

13   new charge of possessing or accessing illegal drugs.

14        THE COURT:  Well, one of the questions you asked is

15   relative to Agent Coulter, and he said that Agent Coulter had

16   asked him to rate his health on a scale of one to ten.  And

17   then I believe your client said that he was also asked about

18   drugs that he had been doing or doing that day.  And then you

19   asked him, "Did you respond to that?"  And he said he did

20   respond.  So are you saying that he's refusing to answer any

21   further questions about what drugs he may have been doing or

22   doing that day, having opened the door to that line of

23   questioning?

24        MS. STRONG:  I didn't recall that I asked him about

25   that day.  The agents' notes and report indicate they asked him

63

1    about drug use prior to that day.

2        THE COURT:  Okay.  Is he willing to and are you going

3    to allow him to answer questions about what drugs he had been

4    doing or at least tell us how he responded to that question of

5    whether he had been doing drugs?

6        MS. STRONG:  I would allow him to relate his best

7    recollection as to what he told the agents, but not the

8    independent -- as the government asked, "What drugs did you

9    actually do on that date," referring again to March 27, 2014.

10   To that he would assert his Fifth Amendment right.

11       THE COURT:  So I'm interested in what his response

12   is, and then I'll decide what I'm going to do about Mr. Volk's

13   question.  How did he respond to that question from Agent

14   Coulter about whether he had been doing drugs or words to that

15   effect?

16       MS. STRONG:  Well, he did give a generic response

17   about his use of the drug meth and how he uses it, but I -- my

18   recollection is he did not give a time period, but it might --

19   if there was a time period, it would have been prior to

20   March 27, 2014.  That is what I believe the agents' report and

21   notes reflect.

22       THE COURT:  Well, continue on, Mr. Volk.  I'm going

23   to cerebrate on your question, and I may just simply give

24   counsel an opportunity to brief that issue or tell me what

25   cases they feel are relevant and support their position, but my

1    inclination is that the door has been opened slightly.

2         MR. VOLK:  All right.  Your Honor, I'll make an

3    effort to ask these questions appropriately.

4    **Q.**  (MR. VOLK CONTINUING)  Mr. Jackson, did you tell the

5    agents that you slam and smoke methamphetamine during this

6    interview?

7    A.   Yes, sir.

8    **Q.**  Did you tell them -- did you use the words "fucked up" and

9    "I can't remember"?

10   A.   Yes, sir.

11   **Q.**  Did you feel like you were fucked up and under the

12   influence or under the influence during the course of this

13   interview?

14   A.   No, sir.

15   **Q.**  You were completely fine from your physical health

16   standpoint at that point in time?

17   A.   Yes, sir.

18   **Q.**  You were not under the influence of anything?

19   A.   No, sir.

20   **Q.**  Did you tell the officers you had been up since your

21   birthday?

22   A.   Yes, sir.

23   **Q.**  Your birthday was March 22nd, is that correct?

24   A.   Yes, sir.

25   **Q.**  And that interview took place on March 27th, is that

1    right?

2    A.    Yes, sir.

3    **Q.**    So you had been up for five days straight?

4    A.    No, sir.

5    **Q.**    But that's what you told them.

6    A.    I got confused.

7    **Q.**    Did you tell them the only sleep that you have had is the

8    time you had slept just prior to that interview, while you were

9    in the jail?

10    A.    Yes, sir.  Again, I got confused.

11    **Q.**    So you're saying today you had slept plenty, had plenty of

12    sleep from your birthday until the time of the interview?

13    A.    Yes, sir.

14    **Q.**    You were not under the influence of anything, correct?

15    A.    Yes, sir.

16    **Q.**    At the time of the interview?

17    A.    Yes, sir.

18    **Q.**    And you felt perfectly fine physically.

19    A.    Yes, sir.

20    **Q.**    Then why did -- did you tell the officers that you rated

21    your health at a three on a scale of one to ten?

22    A.    Why did I?

23    **Q.**    Did you?

24    A.    Yes, sir.

25    **Q.**    Why did you do that if you felt physically fine?

1   A.   Again, I was confused with the question.

2   **Q.**   Did you show your hands to Agent Coulter?

3   A.   Yes, sir.

4   **Q.**   But you didn't do that on your own?  He instructed you to

5   do that?

6   A.   Yes, sir.

7   **Q.**   Is that your testimony?

8   A.   Yes, sir.

9   **Q.**   Did you tell the officers you did not know when you had

10   cut your hair last?

11   A.   Yes, sir.

12   **Q.**   At that time you knew when you had last cut your hair,

13   isn't that right?

14   A.   Yes, sir.

15            MR. VOLK:  That's all the questions I have, Your

16   Honor.

17            THE COURT:  Anything else?

18            MS. STRONG:  I have nothing further, Your Honor.

19            THE COURT:  All right.  Any other witnesses that you

20   wish to call?

21            MS. STRONG:  We have no further witnesses, Your

22   Honor.

23            THE COURT:  Mr. Volk, any --

24            MR. VOLK:  I have no rebuttal witnesses.

25            THE COURT:  Okay.  Do either counsel wish to submit

1   something in writing post-hearing or simply comment on the

2   state of the evidence at this stage, or what are your wishes?

3            MR. VOLK:  I guess I would prefer to submit something

4   in writing, Your Honor, given the --

5            MS. STRONG:  Your Honor, I would too.  It's going to

6   be brief and focused on, I think, just some follow-up.  And I

7   don't think we need a transcript just on the assertion of

8   rights and the -- and perhaps this issue that we have

9   discussed, this evidentiary issue, so --

10           THE COURT:  Well, Mr. Volk, are you still pressing

11  that issue?

12           MR. VOLK:  Well, I think the answers that are there

13  are enough for me to work with, Your Honor, so I don't know

14  that we need to press that issue any further, Your Honor.  He's

15  answered the questions I think that are necessary here.

16           THE COURT:  So you really need not brief that issue,

17  I guess --

18           MS. STRONG:  All right.  So just the --

19           THE COURT:  -- unless you want to, but the U.S.

20  Attorney's Office isn't -- apparently not pushing the issue of

21  a response to the first question that Mr. Volk asked that you

22  objected to.  Well, I'll give everybody -- there's a holiday

23  that's quickly approaching, but the two of you tell me how much

24  time that you feel you need to submit some legal arguments

25  post-hearing, and I'll give you what time that you feel you

1    need, and --

2            MR. VOLK:  I would ask for two weeks at least, Your

3    Honor.

4            MS. STRONG:  That sounds fine to me, Your Honor.  We

5    can just do it simultaneously.

6            MR. VOLK:  Maybe by -- put it on a Friday.  Two weeks

7    from this Friday.  That'd be the 17th, I think.

8            THE COURT:  So that would be -- whatever you file,

9    please file by on or before Friday, July 17th, the end of the

10   workday.  And whatever you file, unless there's extenuating

11   circumstances, try to limit it to pages of reasonable length,

12   knowing that reasonable people have to read it.

13           MR. VOLK:  Understood, Your Honor.

14           THE COURT:  Anything else?

15           MR. VOLK:  No, Your Honor.

16           MS. STRONG:  No, Your Honor.  Thank you.

17           THE COURT:  All right.  Thank you.  We will stand

18   adjourned.

19               (A brief recess was taken.)

20           THE COURT:  We're back on the record.  I just had one

21   follow-up question that I -- I'd like you to address in

22   whatever you submit.  And my question is whether there's any

23   Eighth Circuit case law or other federal circuit case law

24   that's addressed the issue of whether there's a need to

25   re-Mirandize an individual if they, in fact, have been read

1    their Miranda warnings and/or tribal court warnings at

2    5:13 p.m. and their next time that there's any questioning

3    conducted is four-and-a-half hours later.  Any questions, or --

4              MR. VOLK:  No, I understand what the Court is asking,

5    Your Honor.  We can address that.

6              MS. STRONG:  We understand as well, Your Honor.  I

7    think it's an important point.

8              THE COURT:  All right.  Thank you.

9              (Proceedings concluded at 3:40 p.m., the same day.)

10                   - - - - - - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>CERTIFICATE OF COURT REPORTER</u>

2          I, Sandra E. Ehrmantraut, a Certified Realtime

3    Reporter,

4          DO HEREBY CERTIFY that I recorded in shorthand the

5    foregoing proceedings had and made of record at the time and

6    place hereinbefore indicated.

7          I DO HEREBY FURTHER CERTIFY that the foregoing

8    typewritten pages contain an accurate transcript of my

9    shorthand notes then and there taken.

10         Dated:  August 12, 2016

11

12                          <u>/s/ Sandra E. Ehrmantraut</u>
                            Certified Realtime Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

71