UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


United States of America,      )
                               )
                Plaintiff,     )
                               )
        vs.                    )      File No. 4:14-cr-135
                               )      Appeal No. 16-2433
Terrance C. Jackson,           )
                               )
                Defendant.     )


<u>TRANSCRIPT OF SENTENCING</u>


Taken at
United States Courthouse
Bismarck, North Dakota
May 16, 2016


BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

<u>APPEARANCES</u>

MR. RICK LEE VOLK
MS. BRANDI SASSE-RUSSELL
U.S. Attorney's Office
220 E. Rosser Ave
P. O. Box 699
Bismarck, North Dakota 58502-0699


                                        FOR THE UNITED STATES


                    - - - - - - - - - -


MS. PENELOPE STRONG
Attorney at Law
2517 Montana Avenue
Billings, Montana 59101



                                        FOR THE DEFENDANT

                    - - - - - - - - - -

<u>GOVERNMENT WITNESSES</u>

<u>Page No.</u>

<u>Pansy Eckiss</u>
  Direct Examination by Mr. Volk                             6


<u>Billie Eckiss</u>
  Direct Examination by Mr. Volk                            10


<u>Garrett S. Smith</u>
  Direct Examination by Mr. Volk                            13
  Cross-Examination by Ms. Strong                           15


<u>Pansy Eckiss</u> (Statement of Harvey Smith, Jr.)
  Direct Examination by Mr. Volk                            17


<u>Garrett S. Smith</u> (Statement of Stephen Selkirk)
  Direct Examination by Mr. Volk                            20


- - - - - - - - - -


<u>DEFENSE WITNESSES</u>

<u>Denise Joyce Kitson</u>
  Direct Examination by Ms. Strong                          23


<u>Iris K. Jackson</u>
  Direct Examination by Ms. Strong                          27


- - - - - - - - - -


Certificate of Court Reporter - Page 57

- - - - - - - - - -

1          (The above-entitled matter came before the Court, The

2    Honorable Daniel L. Hovland, United States District Court

3    Judge, presiding, commencing at 2:30 p.m., Monday, May 16,

4    2016, in the United States Courthouse, Bismarck, North Dakota.

5    The following proceedings were had and made of record in open

6    court with counsel and the defendant present.)

7          THE COURT:  We'll open the record in the case of

8    *United States versus Terrance Jackson*.  Here on behalf of the

9    federal government is AUSA Rick Volk and Brandi Russell, and

10   representing the defendant is Penelope Strong from Billings.

11   And, Mr. Jackson, how are you today?

12          THE DEFENDANT:  All right.

13          THE COURT:  This is scheduled as a sentencing hearing

14   on a charge of second degree murder within Indian country.

15   Last week I reviewed a number of materials in preparation for

16   this hearing.  They include the Presentence Investigation

17   Report.  I went back and reviewed all of my trial notes, a

18   number of documents filed by Ms. Strong on behalf of the

19   defendant, a Notice of Defense Sentencing Exhibits, defendant's

20   Sentencing Objections and Memorandum, several letters of

21   support, all the exhibits that were attached to the Sentencing

22   Memorandum.  I reviewed all of those, and there were probably

23   15 exhibits to the -- submitted by the defendant.  But anything

24   else that was filed here that I did not mention?

25          MR. VOLK:  Your Honor, I don't believe so.

1            MS. STRONG:  No, Your Honor.

2            THE COURT:  And, Mr. Jackson, you were given the

3    opportunity at some point in time to review the Presentence

4    Investigation Report?

5            THE DEFENDANT:  Yes, sir.

6            THE COURT:  And have you had an opportunity to

7    discuss that with your attorney, Ms. Strong?

8            THE DEFENDANT:  Yes, sir.

9            THE COURT:  And were there specific objections that

10   you wanted to make as a part of this hearing to the facts

11   contained in the PSR or the guideline calculations?

12           MS. STRONG:  Your Honor, I believe that we had some

13   objections as to things that are trial facts.  I think we're

14   going to reserve the Court ruling inasmuch as it would depend

15   on how material those are to the ultimate sentence, so we will

16   reserve any objections until the Court imposes sentence.

17           THE COURT:  But with respect to the guideline

18   calculations, did you have any objection to those as outlined

19   in the Presentence Report?

20           MS. STRONG:  We do not, Your Honor.

21           THE COURT:  All right.  Mr. Volk?

22           MR. VOLK:  I have none to the guidelines.

23           THE COURT:  All right.  I've been informed there are

24   some witnesses that intend to testify here today.

25           MR. VOLK:  That's correct, Your Honor.  We have four

1    individuals who would like to speak before the Court imposes

2    sentence on behalf of the victim's family.

3            THE COURT:  You may call them in whatever order you

4    wish.

5            MR. VOLK:  All right, Your Honor.  The United States

6    first calls Pansy Eckiss, Your Honor.

7                    PANSY ECKISS,

8    having been first duly sworn, was examined and testified as

9    follows:

10                    DIRECT EXAMINATION

11   BY MR. VOLK:

12   **Q.**   Good afternoon, Ms. Eckiss.  Could you just introduce

13   yourself to Judge Hovland, please?

14   A.   I'm Gerald Smith's mother, Pansy Eckiss.

15   **Q.**   And, Pansy, there's something that you wish to say before

16   the Court imposes sentence in this case, is that correct?

17   A.   Yes, I do.

18   **Q.**   You could go ahead and just let the Judge know.

19   A.   Well, I lost a huge piece of my heart, and one thing that

20   can't be taken from me is the memories I have of my son.  And I

21   feel that my son, he didn't -- he'll never get to know his

22   kids.  And he had a baby that was unborn when he got his life

23   taken.

24            And how I'm affected by it, life has changed forever.

25   I can't imagine -- I couldn't wish something on my worst -- to

6

1    anybody to lose what I lost in my life, but one thing I'm

2    thankful for is the memories that I have of my son.  I'll

3    always treasure those as something that can't be taken from me.

4           And my recommendation -- my son is not here.  I'll

5    never have a chance to get a phone call from him or for him to

6    say, "Hey, Mom, I love you.  Is there something that" -- you

7    know, what can I do?  You know, I mean, that boy was a

8    peacemaker.  There's a lot of things that were said.  In fact,

9    he was one of the youngest ones to build an earth lodge when he

10   came out of prison.  He was walking the red road, and he lost

11   his way.  He was picking trash.  He was picking trash --

12   picking up somebody else's trash when he lost his life.  He was

13   building -- he built an earth lodge in Twin Buttes.  He was one

14   of the youngest ones on that crew that successfully completed

15   that earth lodge.  And like when everything came out, my son

16   was clean.  He didn't have no heroin.  He didn't have meth in

17   his body and -- and no alcohol.  That should tell a lot.

18          But my son can never in 30 years -- the

19   recommendation for that man there is never -- in 30 years I

20   can't get my son to come back out of that grave and say, "Hey,

21   I can relive my life."  He can't.  In the Bible it says eye for

22   an eye.  I mean, that's not my sentence.  That's not mine to

23   give -- to judge anybody.  This isn't judgment day, but 30

24   years to me is a slap on the wrist.  I mean, that's -- 30 years

25   is nothing.  In 30 years I'll never have -- I can't get my son

1    back.  My grandson will be 34 years old.  His daughter will be

2    30 years old.  There's nothing -- they'll never know their

3    father.  That was -- that was my son.

4    **Q.**  Pansy, you ended up paying for some funeral expenses, is

5    that right?

6    A.   Yes, I did.  My son wasn't an enrolled member.  That was

7    his choice not to be enrolled.  And there's a lot of things I

8    could ask for materialistically for restitution, but I won't

9    because I'm a humble person.  I'm humble, but for his funeral,

10   I want restitution for my son.

11   **Q.**  And the tribe did pay some portion of that?

12   A.   The tribe paid a portion of it.  They did pay a portion of

13   it.  There's still a -- there's still a balance left on my

14   son's funeral.

15   **Q.**  So the tribe would have paid a little over 5,000, but the

16   remaining $4,699 is your responsibility --

17   A.   Yes, sir.

18   **Q.**  -- is that right?

19   A.   Yep.

20   **Q.**  And that's what you're requesting for restitution?

21   A.   Right.

22   **Q.**  Is there anything else that you would like to tell the

23   Judge before sentence is imposed in this case?

24   A.   Just life has changed -- you know, forever changed.  I

25   mean, there's always that -- I mean, like I said, that empty --

1    for me to be here is -- it takes a lot not to be emotional

2    because, like I said, the memories I have of my son, I'll

3    always have that.  That's something that can never be taken

4    from me, and I just -- there's a hole.  There's a missing link

5    in our family now.  I mean, everybody is traumatized, and

6    there's a huge loss.

7            Gerald was a peacemaker.  He was the -- he was the

8    backbone and brought everybody together when there was little

9    -- you know, things going on in our family.  He was the one to

10   bring everybody back together, and now we don't have that.  You

11   know, we just -- just a missing link, and you can't replace

12   that missing link with anything, you know.  It's just -- it's

13   gone.

14           MR. VOLK:  Thank you, Pansy.

15           THE WITNESS:  Thank you.

16           THE COURT:  Ms. Strong, do you have any questions?

17           MS. STRONG:  No.

18           THE COURT:  All right.  Thank you for being here.

19           THE WITNESS:  Thank you.

20           THE COURT:  You may step down.

21           MR. VOLK:  Call Billie Eckiss next, Your Honor.

22                      BILLIE ECKISS,

23   having been first duly sworn, was examined and testified as

24   follows:

25       ///

1　　　　　　　　　　DIRECT EXAMINATION

2　BY MR. VOLK:

3　**Q.**　Billie, could you introduce yourself to Judge Hovland,

4　tell him who you are and how you're related to Gerald?

5　A.　Good afternoon, everybody.　My name is Billie Eckiss.　I'm

6　Gerald's uncle.

7　**Q.**　All right.　And you wish to make some comments to Judge

8　Hovland?

9　A.　Yes, I would like to make some comments.

10　**Q.**　Sure, if you could please just let him know what --

11　A.　Good afternoon, my relatives, friends, family.　My name is

12　Old Gun.　He -- first of all, I want to say I'm glad everybody

13　got to make it here.　I want to first say that it's been a hard

14　struggle these last two years.　I've been to a lot of sweats, a

15　lot of ceremonies and prays to Monadarka (ph) to give me

16　strength to come up here and talk in front of you people.

17　　　　　　　There's been a void.　Gerald and I were very, very

18　close.　There ain't nothing in this world, like I said, I would

19　wish on my worst enemy.　My mother always said you pray for

20　your enemies.　Brought up in -- a strong Catholic family we

21　were brought up in, and Gerald -- I was told to describe in

22　your heart what you think of who he is, what he is, my nephew,

23　my Mazug (ph).　Well, today I'm going to tell you, you people,

24　what my Mazug is all about.　It's got power, believer, keeper,

25　loving, caring, compassion.

10

1          Things I will miss about my Mazug is, come over and

2     see uncle.  "Uncle, how are you?  Uncle, how's everything

3     going?  Uncle, I love you."  Those three -- those three things

4     I will miss today because of what happened with this individual

5     right here.  Those words are -- those things, they mean so much

6     to you.  We take a lot of things for granted when we're in this

7     world nowadays, that's what -- we take a lot of things for

8     granted in this world.

9          As far as my -- my nephews, he had a boy named

10    Forest.  That little boy I think the world of.  I told my

11    nephew, "If anything should happen to you or I," I said, "I'll

12    take care of him or you'll take care of him."  And today I take

13    care of that little boy like his dad would if he was here.  His

14    dad thought the world of him, did the best, so today that's

15    what I'm going to do.  I'm going to take care of him.  Even

16    though his dad is not around no more to say, "Dad, I want this;

17    Dad, I want that," I'm going to be the one to do that.

18          When he asks his grandpa, "Grandpa, where's my dad

19    at; Grandpa, will my dad ever come back; Grandpa, what did my

20    dad have to go for," I try to tell him that.  I was going to

21    bring him here today.  They said, "No, don't bring him here.

22    Don't let them see who killed him.  Don't let him see that."

23    So I said, "Okay, I'll leave him at home," and that's where I

24    left him at, is a home.

25          And they asked me for a recommendation.  As I drove

1   up from Shell Creek today, I said a prayer.  I went out towards

2   the east and said a prayer, talked to Monadarka, asked him,

3   "Help me, Grandpa.  You're the -- you're the believer.  You're

4   the stronger."  I believed in my traditional ways.  I was

5   brought up in my traditional ways.  "Help me.  Give me that

6   mouth to speak at the -- at that courtroom.  Tell me what I

7   should take -- what I should say."

8            And like they said, the recommendation here is

9   30 years.  Thirty years my nephew, my Mazug, won't be able to

10   say, "Uncle, how are you; Uncle, I love you."  So today my

11   recommendation from my heart is 50 years to life.  Let him sit

12   in there and think of what he did.  Let him sit there and think

13   of what he did, and let him hurt sometimes like we hurt in our

14   family.  (Unknown language spoken).

15            MR. VOLK:  Hold on, Billie, one second.  All right.

16   I have no other questions, Your Honor.

17            THE COURT:  Do you have any questions, Ms. Strong?

18            MS. STRONG:  No.

19            THE COURT:  Thank you, sir.  You may step down.

20   Thank you for being here.

21            MR. VOLK:  Call Garrett Smith, Your Honor.

22                    GARRETT SMITH,

23   having been first duly sworn, was examined and testified as

24   follows:

25       ///

12

1            DIRECT EXAMINATION

2    BY MR. VOLK:

3    **Q.**   Good afternoon, Garrett.  Can you introduce yourself to

4    the Judge and let him know how you're related to Gerald,

5    please?

6    A.   Hi, I'm Garrett Smith.  I'm Gerald's brother, younger

7    brother.

8    **Q.**   How old are you today, Garrett?

9    A.   Twenty-three.

10   **Q.**   And you wish to address the Court before sentence is

11   imposed here?

12   A.   Yes, sir.

13   **Q.**   Go ahead and let the Judge know.

14   A.   To me this is about, you know, telling how Gerald affects

15   my life.  You know, I'm -- I don't know.  People -- some people

16   might have thought of him as a monster, you know, I mean, but

17   to us we loved him.  You know, I can say that because I share a

18   birthday with him, you know.  We're both born on June 23rd, you

19   know, just a year apart, so our relationship to me was

20   significant, so when I heard that I had lost him, you know,

21   initially it was hatred, you know.  I'm expected to come here

22   and say I hate him, but I don't because that's going to ruin my

23   life.

24           It's just been hard because I -- I know what Gerald

25   meant to us.  We don't need everybody else to get that, you

13

1  know, because that's what we have.  We always have that with

2  each other, you know.  I was very bitter.  I went through a

3  stage of depression.  I tried killing myself.  I've been

4  diagnosed with anxiety, depression.  I became an alcoholic

5  because I could not accept the fact of what had happened, you

6  know, because I lost someone beautiful to me.  He was literally

7  in this life and, frankly, my best friend.  This ain't -- I

8  didn't think of what I was going to say.  You know, I can just

9  say this, I have nothing written.

10           But when it comes to imposing a sentence, you know,

11  that's not me.  You know, that's not -- I mean, that's not my

12  -- that's not me.  You know, I mean, I just want him to

13  understand how hard it is for us, you know.  Every day we have

14  to sit there, every time we talk, I have to hear my mother say,

15  "Hey, you know, I miss my son.  I miss your brother."  You

16  know, my -- my sons don't get to be like, "Oh, you know, how's

17  Uncle Gerald doing?"  They'll never get -- you know, they never

18  will.

19           And I have to come up here and tell myself I have to

20  accept that.  You know, I have to accept.  And it's unfortunate

21  and it's sad for all of us, you know, everyone involved to be

22  here today.  You know, it really is.  It's depressing, and it's

23  a tragedy for us especially.  I'm not going to downplay that

24  whatsoever.  When it comes to imposing a sentence, I mean,

25  that's not -- I'm not -- that's not my -- that's something I

14

1   cannot suggest.  It's not.

2   **Q.**   That's fine, Garrett.  Is there anything else that you

3   wish to tell the Judge before --

4   A.   Gerald was an important part of our family.  He really

5   was, you know.  To some he might have been a monster, a

6   criminal.  Of course, we all have a past.  I have a past.  It

7   doesn't hold me back.  I plan on moving forward with my life,

8   in which I've done, so -- but that's not a right to kill

9   somebody.  That's all I have to say.

10          MR. VOLK:  All right.  Thank you.

11          THE COURT:  Any questions, Ms. Strong?

12          MS. STRONG:  I do.

13                    CROSS-EXAMINATION

14   BY MS. STRONG:

15   **Q.**   Mr. Smith, you and your brothers knew Terrance Jackson.

16   You grew up in the New Town area together, is that correct?

17   A.   Yes, ma'am.

18   **Q.**   And there were fights and skirmishes since Gerald and

19   Terrance were teenagers, right?

20   A.   I would say I only know of one, to be honest.  We had one

21   altercation when I was younger.  That's it.  Between him and I

22   personally, just one.

23   **Q.**   But did you know -- I was referring to arguments or

24   altercations between Gerald and my client, Terrance?

25   A.   Yes, ma'am, I just said I'm aware of one.

1    **Q.**   And you know that they were in the North Dakota

2    penitentiary together also.

3    A.   Yes, ma'am.

4    **Q.**   So there is some history there between your family and

5    his, correct?

6    A.   Yes, ma'am.

7    **Q.**   Okay.

8    A.   Can I say something?

9            MS. STRONG:  I have nothing further.

10           THE WITNESS:  Can I say something to that, though?

11           MR. VOLK:  Yes, Garrett, is there something --

12           THE WITNESS:  Frankly, can I ask her?  Does that --

13   does that give him the right to kill, to take a life?  If I

14   have history with someone, does that give me right to take a

15   life?  Literally, depending -- that's not my place to say, oh,

16   we have history, so I'm going to take your life.  Regardless,

17   if it's on purpose, does that give me a right?  I don't think

18   so.  I don't.

19   **Q.**   (MS. STRONG CONTINUING)  And I -- I agree with you that it

20   doesn't, but it may be a factor for sentencing, sir, and that's

21   why I asked you to confirm whether there was history.  And do

22   you know Mathias Mariner?

23   A.   I don't.  Mathias, that's his little brother.  I know him

24   by Jackson, not Mariner.

25   **Q.**   And are you aware that Mathias has been threatened and

16

1   assaulted since this case began?

2   A.   Was it from me, my family?  Who's sitting here now, was it

3   from one of us?

4   Q.   Well, that's what some people have said.  It's unclear.

5   A.   I haven't even been living in North Dakota, none of us

6   have.

7   Q.   Okay.  All right.  So you don't know anything about that,

8   sir?

9   A.   No, ma'am.

10          MS. STRONG:  All right.  Thank you.

11          THE COURT:  All right.  Thank you, sir.  You may step

12   down.  Thank you for being here.

13          MR. VOLK:  United States calls Harvey Smith.  Your

14   Honor, we'll recall Pansy Eckiss.  She would like to read a

15   statement for Harvey at this point.

16          THE COURT:  All right.  You don't need to be sworn in

17   again.

18                    PANSY ECKISS,

19   having been previously sworn, was examined and testified

20   further as follows:

21                  REDIRECT EXAMINATION

22   BY MR. VOLK:

23   Q.   All right.  Pansy, you wanted to --

24   A.   I'm going to --

25   Q.   -- tell the Court something for Harvey, on his behalf?

17

1   A.    Yeah, I'm going to write -- I mean I'm going to read

2   something that my middle son wrote, which was Gerald's brother,

3   middle brother.  He says, "My name is Harvey Smith, Junior.

4   I'm Gerald's older brother.  My brother, Gerald, was a good

5   person.  Something maybe -- Gerald was a good person, but" --

6   excuse me.  I just -- take me a minute.  "By no means a bad

7   person, always a big heart.  It helped me to be given -- he'd

8   take his shirt off his back if he -- if the cause called for

9   it.

10           "My brother, Gerald, was never one to be or ever

11   tried to be the center of attention, but was always willing to

12   say that one of the two things was -- would make people who

13   were around to laugh or at least crack their smile before

14   anything.  My brother, he was a family guy that would -- he

15   was -- he was able to help out whenever he could, if just to

16   lend an ear or to listen.  I called -- I could go on and on

17   about how great my brother was, no -- no exaggeration.  No

18   understatement, my brother, Gerald, helped out and touched the

19   lives of so many people.  Two years later it feels emotionally

20   and spiritually only two days ago.

21           "How will I -- how will I be affected the rest of my

22   life is I will no longer get the luxury of seeing my little

23   brother's face, to hug him, kiss him on the cheek, or to simply

24   tell him I love him.  I know he's in a better place, and he is

25   no longer going through the trials and tribulations that --

1   being here on this earth.

2           "What makes me and my family -- what me and my family

3   have been through and my little brother being murdered for

4   literally a senseless crime, the emotions hurt.  I would not

5   wish this on anyone, not even -- not even -- all I want for

6   this person is to sit the rest of his life -- his material life

7   in prison.  My little brother died.  My little brother does not

8   have the right to laugh, smile, to be physically with his --

9   with his family.

10          "Just simply being around I feel that his presence --

11  his -- he feels -- I feel like this murder should not get the

12  right because my brother -- my brother, Gerald, doesn't have a

13  right just by struggling and hurting -- that big knife into my

14  little brother's heart by the hands of Terrance Jackson.  Just

15  don't want no other person or family to have to go through what

16  -- the heartache and the pain that me and my family have to go

17  through the rest of our lives."  That's it.

18          MR. VOLK:  Thank you, Pansy.

19          THE COURT:  Thank you.

20          MR. VOLK:  If I may, Your Honor, we'd call Garrett

21  Smith.  He has something from another family member he wants to

22  read as well.

23                          GARRETT SMITH,

24  having been previously sworn, was examined and testified

25  further as follows:

                                19

1                      <u>REDIRECT EXAMINATION</u>

2    <u>BY MR. VOLK</u>:

3    **Q.**    Garrett, you have something that was posted by a family

4    member that you wish to read, is that correct?

5    A.    He's a witness.  He was there.

6    **Q.**    Okay.  And who was that?

7    A.    Stephen.

8    **Q.**    Okay.

9    A.    I'm not quite sure how to pronounce his last name.

10                    THE COURT:  Stephen Selkirk?

11                    THE WITNESS:  Yes, sir.

12                    THE COURT:  He testified at the trial, right?

13                    MR. VOLK:  Yes.

14   **Q.**    (MR. VOLK CONTINUING)  Go ahead.

15   A.    This is from Stephen.  "On March 28, 2014, at

16   approximately 3:00 p.m., I witnessed the murder of unarmed

17   Gerald Allan Smith, 22, by Terrance C. Jackson, 24, on the

18   Mandan Hidatsa Arikara Reservation near New Town, North Dakota.

19   What struck me about it was the senselessness of the act and

20   the sickening beauty of Smith's death.

21                    "The world will not mourn Smith's passing, will not

22   take note of just another young American Indian's death on a

23   reservation in the center of the planet's most immensely

24   profitable oil field.  Smith's passing is only a cold

25   statistic, and that is the truth.  And yet to his family and

                                  20

1    friends, his death was life-shattering, and certainly for his

2    little boy, both the center of each other's world.

3            "I did not know Smith.  Whether he was a credit to

4    society or a blot, I cannot say, and certainly it is not my

5    place to judge.  But I will say this in the way of kind of

6    eulogy, after testifying at his killer's trial in Bismarck, and

7    moving on:  I know well what cowardice and bravery in the face

8    of certain death look like.  Afghanistan and, more especially,

9    the convoy routes of Iraq taught me that.  Sometimes you see

10   extreme grace as death nears, and it is a fiercely beautiful

11   thing.  This was the case in the final moment of Gerald Smith's

12   life.  He died out in the middle of a long stretch of

13   sun-splashed open highway fronting a glittering Lake Sakakawea

14   under skies of electric blue, evading a surprise attack with

15   skilled composure.

16           "Oddly, Gerald never made an offensive or aggressive

17   move.  We may never know why, yet clearly his moves and skill

18   set were such that if he had wanted to, he could have better

19   defended himself by going on the offense.  He was every inch

20   the prizefighter in his last moment, bobbing, weaving, ducking

21   and turning, his back-and-away footwork the nearly perfect

22   shuck-and-jive dance of a professional boxer.

23           "He was facing his attacker unarmed, but with

24   remarkable fearlessness, a peacemaker trying to calm his killer

25   without turning tail and running away.  When you're ambushed,

1   caught out in the open, outnumbered, surrounded with no place

2   to run and no one to come to your aid, there's not a lot you

3   can do but play the deadly hand you're dealt.  Smith played

4   that fatal hand well, facing his killer head on.

5           "So what's the point of all this, you ask?  In

6   Smith's last seconds following the lightning thrust of a big

7   knife to his heart, I bear witness to this:  As he was slipping

8   into shock, before he lost consciousness, Gerald Allan Smith

9   was standing.  His knees were failing.  He was fighting for

10  air.  He died in pain, yes, but not for long.  There was sorrow

11  and resignation in his eyes and determination too for he was

12  never on his knees.  Mark this, he died on his feet.  That's

13  what I'll always remember about Gerald Allan Smith.

14          "As a Métis man in the odd position of having been

15  decorated by both the United States Army and recognized by the

16  modern American Indian Movement, having had the humbling

17  experience of eagle feathers gifted from a veteran of Wounded

18  Knee, yet having served in the Seventh Cavalry in Tall-Afar,

19  Sinjar and Al-Amarah, but more so as one who has experienced

20  the battlefield and seen the most gallant of acts, I can offer

21  this final tribute.

22          "In his final moment, Gerald Smith faced down

23  humanity's greatest fear with supreme restraint and grace, with

24  dignity and with honor.  In my eyes he proved himself a warrior

25  in the best sense.  Whatever his life may have been, I would

1   want you and his little boy to know that Gerald died bravely.

2   There is much to be respected in that."  And that is it.

3          MR. VOLK:  Thank you, Garrett.  That's all the

4   witnesses I have, Your Honor.

5          THE COURT:  Ms. Strong, do you have any witnesses

6   that you intended to call?

7          MS. STRONG:  I do, Your Honor.

8          THE COURT:  All right.

9          MS. STRONG:  The first witness we would call would be

10  Joyce Kitson.

11                     DENISE JOYCE KITSON,

12  having been first duly sworn, was examined and testified as

13  follows:

14                     DIRECT EXAMINATION

15  BY MS. STRONG:

16  **Q.**   Would you state your name for the record and spell your

17  last name, please?

18  A.   Denise Joyce Kitson.

19  **Q.**   And, Mrs. Kitson, are you related to Terrance Jackson,

20  and how?

21  A.   Yes, I am.

22  **Q.**   And would you tell us how?

23  A.   Okay.  It's through my -- on my dad's side, the Dancing

24  Bull.

25  **Q.**   All right.  And what type of background do you have in

1   terms of spiritual guidance, working with inmates and things

2   such as that?

3   A.    Okay.  I've been in street ministry for quite a few years.

4   I don't go around telling everybody that, but I really think

5   there's a need for support for inmates when they get out of

6   prison because I have a son, nephews that are in and out of the

7   state prison, and a lot of people in this city, in this state

8   know me.  I've helped their family many, many times because

9   there isn't an adequate system in place in our state, that

10  people are homeless when they get out of prison -- long-term in

11  prison.  They're locked in long -- for long periods of time,

12  and they suffer when they get out.  My son -- I saw my son

13  suffer.  They can't adjust to the society unless they have

14  help.

15  **Q.**  All right.  And do you also have a degree in addiction

16  counseling?

17  A.    Yes, I do.

18  **Q.**  And are you also in -- involved with the North Dakota Arts

19  Council and --

20  A.    Yes, I am.  I'm a master apprentice through the state.

21  **Q.**  And did you start to communicate with Mr. Jackson after

22  these charges were brought?

23  A.    Yes.

24  **Q.**  And did you provide him -- by the way, are you a sober

25  individual?

1    A.    Yes, I have over 18 years sobriety, even cigarettes.  I've

2    been sober since May 28th, coming up here for a birthday, and

3    because -- and this is what I said to Terrance, is -- I drove

4    to Devils Lake and I told him, I said, "Just like my son, my

5    grandson, my nephew," I said, "if you would spend time with

6    me -- it's up to you.  I'll give you that choice.  All the

7    things that I've ever learned in my whole life that's kept me

8    clean and sober and straight.  And as an elder, I like to spend

9    time with you to -- readings, teach about values, spiritual,

10   how I relate to God.  How I found peace all these years I would

11   like to share with you."  So I gave him a choice, and he -- he

12   said yes.

13   **Q.**  And did you see him pretty frequently throughout his

14   incarceration --

15   A.    Yes.

16   **Q.**  -- depending on where he was?

17   A.    Yes.  I knew exactly where he was.  I followed him.  I

18   stalked him.  I wanted to make sure I knew where he was at all

19   times and to make sure that I prayed for him as well in the

20   system, you know, because I know how, you know, sometimes

21   there's stuff that goes on in the jails, so I wanted to comfort

22   him while he was in there as an elder and as a relative and in

23   prayer.

24   **Q.**  And --

25   A.    As we're sitting here now, we have people praying for this

1    courtroom and this place.

2    **Q.**   And was he open to the materials that you sent to him on

3    chemical dependency, spiritual development, that type of thing?

4    A.   Yes.  I had especially some favorite readings that I sent

5    to him, and I listed them on the letter that I gave to the

6    Judge.  And there's actually more because since he's been back

7    in Bismarck a couple days, I sent him two more writings and

8    encouragement because I know that it's important to have

9    support of family and, you know, relatives and friends.  So I

10   printed out seven -- let's see -- seven of all of the teaching

11   items as an elder that I would want my kids to learn or my

12   grandchildren and just to get to know their character and

13   discover who they are and also, you know, what it means to pray

14   and to forgive and not live with bitterness.

15           And I told him boundaries.  When he's in -- sitting

16   in the jail, sometimes there's going to be people that attack

17   us, come against us with words and bitterness and emotions.  I

18   told him to -- I gave him all kinds of readings to understand

19   the internal and external boundaries.

20           And my favorite one was The Gift in You, that it

21   isn't always about you.  When somebody walks in the room and

22   they're full of hatred, you know, and you're sitting there at

23   peace and they're -- you know, it's not always about us and to

24   pray for them that -- you know, because it's full-time.  It's a

25   full-time job being bitter, a -- bitter and hatred, so I kept

26

1    telling him that.  And I would bring something new every week.

2    And even The Orphan Heart was my favorite one I sent to him,

3    and that --

4    **Q.**   Joyce?

5    **A.**   Huh?

6    **Q.**   Excuse me.  And do you -- do you have hope that you will

7    continue your dialogue or relationship with Terrance regardless

8    of where he's placed in the --

9    **A.**   Regardless of where he's at, I will send -- I do this for

10   other families and relatives and friends that are inmates that

11   their family requests me.  I send them comforting stuff, phone

12   calls.  And even when he got here, I made sure he had money in

13   his account to talk to his mom.

14           MS. STRONG:  All right.  Thank you.  Appreciate it.

15           MR. VOLK:  No questions, Your Honor.

16           THE COURT:  Thank you.  You may step down.

17           MS. STRONG:  Could I have a moment, Your Honor?  We

18   would call Iris Jackson.

19                          IRIS JACKSON,

20   having been first duly sworn, was examined and testified as

21   follows:

22                      DIRECT EXAMINATION

23   BY MS. STRONG:

24   **Q.**   Would you state your name for the record, please?

25   **A.**   Iris K. Jackson.

1    **Q.**   And, Iris, you have already submitted a letter to the

2    Court, correct?

3    A.   Yes, I have.

4    **Q.**   And are there some additional matters that you would like

5    to speak to at this time?

6    A.   Yes, I do.

7    **Q.**   All right.  And what are those, Iris?

8    A.   First of all, I want to apologize to you people.  I want

9    to apologize to -- there's nothing -- not a day that goes by

10   that I think -- I remember because I drove by that day.  At six

11   minutes after 3:00, I drove by that day when your -- my son and

12   your son were fighting.

13          But, you know, it's been a good ten long years

14   because they've had a past.  Your son shot at my house.  He

15   stabbed my son.  They beat him up.  If not, they're going to

16   get somebody else to beat him up.  Mine -- I'm not saying my

17   son is an angel, and I'm not trying to accuse or say anything.

18   Your sons, these boys, Your Honor, have cost me many sleepless

19   nights, and they're still costing me sleepless nights.  I had

20   to get a gun.  I'm supposed to sit up here and tell you that

21   I'm so sorry that you lost your son and I can say hello to

22   mine.

23          And, you know, an eye for an eye, if we were brought

24   up good strong Catholics, revenge is not the word.  I drove by

25   that place every day since that happened because I lived in

1    Sanish, and I prayed for your son.  I put flowers down, and I

2    put a crucifix there.  Every time I drive by there, I pray for

3    him.  I don't know what else to do.

4            My son is not no angel, but he was self-defense for

5    the ten years that he grew up, and you know -- or your boys

6    know the Chase brothers, and your sons and my sons and Preston

7    and Nicholas Young Bird, all of it, it was gangs.  It was a

8    gang.  You guys thought you were in gangs.  My son always got

9    the shitty end of the deal.  Sorry.  The first time he went in

10   prison, he got into a fight, sat in the hole because of the

11   Smith brothers.  Now my son got beat up, and they said because

12   the Smith brothers told him to get beat up.  He got hit with a

13   beer bottle, so if it would have been higher, he wouldn't have

14   been here.

15           I'm sitting up here trying to be strong and trying to

16   not cry.  I'm a mother.  I'm a single parent of five.  I

17   might've not did a good job at raising my kids, but we grew up

18   -- Terrance and them grew up hardship.  I didn't do it by -- it

19   was my choice to become a single parent.  Now when I walk out

20   this courtroom today, what am I going to find?  They're going

21   to call me and say I'm harassing Pansy Eckiss, I broke her

22   windows, I went into her house.  You had to file a restraining

23   order on me.  It's not true.

24           Yes, I went through hell and back with my kid -- all

25   of my kids, but I'm not going to sit here and tell you that --

1    somebody once said, "What do you want me to do with your son?"

2    Get him help.  My son needed help.  If your son was on the red

3    road, why were all these things happening?  I said -- I prayed

4    so hard that I wouldn't have mean feelings coming in this

5    courtroom today, but I'm starting to get mean.  Now I'm going

6    to -- nobody wanted to come because of the repercussions, "Oh,

7    I don't want to do that because of those Smith boys."

8              If those cops could have -- if that jury that sat

9    right here could have heard all of the past doings that you

10   kids did to my son, they would have said different.  They would

11   have said that all these boys bothered him for ten years, that

12   my son took ten years.  I went to tribal court.  They had a

13   court order to pick him up.  Nobody picked him up.  They knew

14   where he was.

15             If that red road was coming and he was supposed to be

16   an angel picking up trash, why did he have brass knuckles to

17   hit my son?  Why is it -- it's not even said.  And this man

18   that wrote this article, it wasn't Friday, March 27th.  It was

19   Thursday at 3:06 because I lost my son that same day.  And I'm

20   going to sit here and look right at you guys.  You might think

21   I'm mean, but I have enough strength because I prayed so hard

22   that I'd sit here and look at you guys.  You guys don't want --

23             (There is a disruption in the courtroom.)

24             THE WITNESS:  It's not going to stop.  It's going to

25   get worse before it gets better.  The individual they just took

1   out of here hit and ran into my daughter February 3rd, and

2   that's what brought this up.  Nothing --

3   **Q.**   (MS. STRONG CONTINUING)  Iris, excuse me.  I'm going to

4   move you to another topic, and that is that Terrance will, of

5   course, receive a long sentence.  Will you always be there for

6   your son, together with --

7   A.   Yes, I will.

8   **Q.**   -- your sisters and his uncles and the rest of your family

9   from New Town and other areas?

10   A.   Yes, I will.

11   **Q.**   And do you believe that you have a strong family that has

12   actually tried to unite as best they can behind Terrance during

13   the two years that this case has been proceeding through the

14   court?

15   A.   Yes.

16   **Q.**   And is there anything else that you would to tell the

17   Judge at this time?

18   A.   Your Honor, my son -- I have four boys.  That little guy

19   sitting back there is probably going to be the next one to be

20   picked on.  My 17-year-old boy, even the chief of police came

21   and said that I got to watch him.  I got to watch him because

22   of certain things that these boys done, and they have put --

23   had somebody else beat him up.  Do I have to worry?  Do I have

24   to sit there and wait in the morning to hear -- or all night

25   long if something happened to my son?

1              I had written in my letter that I would -- I would

2    take it back.  That's my son, and I was behind him 100 percent

3    and beside him when these boys harassed and bullied him.

4    Killing that boy wasn't the right thing, but I'm asking you for

5    leniency because if my son gets another chance, he's going to

6    help somebody else.  He would do anything for anybody.  I can

7    sit here and tell you all about Terrance doing this and that

8    for anybody, helping everybody.  These individuals been in

9    trouble with the law forever, and the life -- and my son just

10   hits one time, and that's it.

11             I went to the tribal court and asked for all his

12   records and all the statements and all the times those boys and

13   my son had it out, and there's no records.  There's no records.

14   There's no records of when his brother ran into my daughter.  I

15   love my son.  If I could take it all away and do the time for

16   you, I will.  I love you.  That's all.

17             THE COURT:  Mr. Volk, do you have any questions?

18             MR. VOLK:  No, Your Honor.

19             THE COURT:  Were you done, Ms. Strong?

20             MS. STRONG:  I am done.

21             THE COURT:  All right.  Thank you.  You may step

22   down.

23             MS. STRONG:  Your Honor, I just need one moment.  I

24   think I have one last witness, and I'll check and be back.

25   Your Honor, we have no further witnesses.

1          THE COURT:  All right.  Then I will give both

2    attorneys an opportunity to outline what they are recommending

3    in terms of a sentence, following which I will give you,

4    Mr. Jackson, an opportunity to speak, as I'm required to do.

5    Mr. Volk.

6          MR. VOLK:  Thank you, Your Honor.  As the Court

7    knows, the guideline range here is 360 months or 30 years to

8    life based upon a total offense level of 38 and a Criminal

9    History Category VI.  My specific recommendation in this case

10   is life imprisonment on Count 1; Count 2, 10 years of

11   imprisonment to run concurrent.  I know the Court is hesitant

12   at times on occasions to impose a life sentence.  If the Court

13   does not impose a life sentence, I think no less than 50 years

14   is appropriate.

15         I'd recommend a five-year term of supervision on

16   Count 1, three years on Count 2, which is the maximum on

17   Count 2; $200 in special assessments; the restitution of $9,895

18   for the funeral expenses for Gerald Smith, $5,196 of that would

19   be paid to the Three Affiliated Tribes, $4,699 due and payable

20   to Pansy Eckiss.

21         Your Honor, I don't make that recommendation lightly

22   in this case.  I know Mr. Jackson is young, but, quite

23   honestly, he's earned every bit of the guideline range that's

24   there.  He's been designated as a career offender in this case,

25   but, quite honestly, whether he's a career offender or he's not

33

1    a career offender, his guideline range is still 360 months to

2    life imprisonment.  I know the guidelines will change at some

3    point this fall and eliminate burglary as a crime of violence.

4    But even if one were to take that designation away, he's still

5    a Criminal History Category V.  His offense level does not

6    change.  Therefore, his range is still 360 months to life.

7            Mr. Jackson, he's been in and out of the court

8    systems, in one court system or another since he's in his young

9    teens.  When you look at the tribal court, it's a sealed

10   history, but he's clearly been in and out of tribal court

11   multiple times.  He began his history outside of tribal court

12   with the federal juvenile delinquency matter, where he and

13   another individual stole 11 guns and other items from a home.

14   It wasn't the Smith family home, somebody completely different.

15           He was put in a placement in Dickinson during the

16   course of that juvenile delinquency matter.  He assaulted

17   another resident or inmate while he was in a placement there.

18   It wasn't the Smith family.  He was convicted as an adult

19   offender at that time, sentenced in, I believe, either in

20   Dickinson Municipal Court or Stark County court.  He was

21   terminated within five months of his placement because he was

22   insolent to staff, he was threatening and challenging to staff

23   and to other residents.  He had his supervision revoked.  He

24   did three months of custody.

25           While that matter was still pending, I believe he

34

1    committed another burglary, and this time, again, of a home

2    where he stole a 12-gauge shotgun and other items.  He was on

3    escape status from the Gerald Tex Fox Justice Center at the

4    time that he committed that burglary.  That gun that he stole

5    was used to commit a state offense of aggravated assault

6    against his then girlfriend, Justine High Horse, and a

7    terrorizing matter, again, not involving the Smith family,

8    somebody completely different.

9            He was sentenced to prison in that case.  While he

10   was imprisoned, he had a substantial amount of institutional

11   misconduct for, among other things, fighting.  Now, one of

12   those may have involved Gerald Smith, but there were several

13   others that didn't.  Those are reflected in the Presentence

14   Report.

15           He was released from prison -- from his state and

16   federal prison sentences.  He was sentenced to partially

17   concurrent time on his burglary case, and on his federal

18   matter, Your Honor -- or, I'm sorry, on his state matter.  He

19   was released from that prison sentence on December 9th of 2013.

20   By March there had been -- March of 2014, that's when a

21   petition to revoke was filed in this case.  He had been using

22   marijuana.  He had been using methamphetamine, possessing drug

23   paraphernalia.  He was told to report to the Bismarck

24   Transition Center.  He did not do that, as he was directed by

25   his probation officer.  They didn't know where he was at.

1          The instant offense conduct occurred while he was on

2     that term of supervision.  The event happened on March 27th.

3     And from the testimony at trial, if the Court recalls,

4     Mr. Jackson admitted he had been using methamphetamine

5     regularly up until that point in time.  He was arrested.  He

6     was revoked.  He was sentenced to six months in custody on that

7     revocation.  While that pending -- while that revocation was --

8     matter was pending, he had more institutional misconduct, and

9     that's when he threw the hot water in the face of Preston

10    Freeman while he was in jail in Rugby, again, not the Smith

11    family.

12          You know, as I look at this, Your Honor, the

13    defendant has been a complete terror to other persons, whether

14    he's been on the street or whether he's been incarcerated.  He

15    has no issue hurting other people, not just Gerald Smith.  The

16    violence has been directed at everyone he has come in contact

17    with.

18          Paragraph 72 of the Presentence Report refers to an

19    evaluation that was done while he was at the North Dakota State

20    Penitentiary.  They diagnosed him with antisocial traits.

21    Paragraph 76 refers to similar characteristics while he was at

22    Dakota Horizons while he was under the juvenile court order of

23    this Court, indicating -- indication by his therapist that he

24    had antisocial type thinking behavior.  Quite honestly,

25    Mr. Jackson's behavior throughout his lifetime is the reason

1     prisons are built, to incarcerate and incapacitate people so

2     they can't continue to hurt other individuals.

3             This isn't the drug case where we have the threat of

4     harm, the potential of harm due to the ingestion of drugs or

5     violence associated with -- the potential violence associated

6     with it.  This is an actual crime of violence where somebody

7     was killed, and the individual who was killed in this case was

8     unarmed and he was picking up trash on the side of the road,

9     period.  He had no weapon.  He had no brass knuckles.  There

10    were no brass knuckles found anywhere.  He was unarmed, and he

11    was stabbed in his heart.

12            Mr. Jackson has been given multiple opportunities to

13    change his behavior and his criminal thinking.  He has not

14    taken advantage of that.  His behavior has become increasingly

15    violent, quite honestly.  When you look at the progression of

16    this, it's been breaking into homes, beating people up, beating

17    people up with weapons, and killing somebody.  That's the

18    progression of his history.

19            I look at this and I think to myself, what -- if the

20    Court imposes only 20 years in this case, what's Terrance

21    Jackson going to look like when he comes out of prison in

22    20 years?  He's going to be in his mid-forties -- early to

23    mid-forties.  He's probably going to be affiliated with groups

24    in a federal prison.  He's probably going to continue, based on

25    his past history, the same type of institutional misconduct

1    that he's engaged in, and he's going to come out one very angry

2    individual.  I'm not sure that's what we should do here, Your

3    Honor, is let him out at that stage of his life, and that's the

4    reason why I'm recommending a significant prison sentence here.

5            I've read through Ms. Strong's Sentencing Memorandum.

6    Quite honestly, when I look at a lot of what's argued there,

7    and I think that's not coming directly from Mr. Jackson, but

8    it's the arguments being made on his behalf, it seems like a

9    complete lack of personal responsibility for what happened

10   here, blaming the U.S. Attorney's Office for not letting him

11   plead to voluntary manslaughter.

12           Well, he wasn't convicted of voluntary manslaughter.

13   Trying to compare his sentence to any other sentence that's a

14   voluntary manslaughter sentence is completely inappropriate.

15   He was convicted of second degree murder.  The jury heard the

16   evidence.  They rejected his self-defense claim.  They rejected

17   the voluntary manslaughter, heat of passion arguments.  The

18   defendant wants the Court to just kind of ignore what the jury

19   did and accept only the evidence that would be favorable to

20   him.

21           He blames the Smith family, Gerald in particular, but

22   the remainder of the Smith family for Gerald now being dead

23   because he's only responding to that; again, lack of personal

24   responsibility for what he did.  He's even blaming the U.S.

25   probation or law enforcement officers for not arresting him

38

1   soon enough, suggesting in part that, well, had they just

2   arrested him quicker, Gerald would be alive.

3          Well, he fled the scene.  He cut his hair.  He hid in

4   a closet.  He had been told to report to BTC.  He didn't do

5   that.  He was using meth daily.  He had no intentions of going

6   voluntarily anywhere, and to suggest somehow law enforcement or

7   the probation office is to blame is, quite honestly, appalling

8   to me, to say they're responsible for Gerald Smith's death.

9          He's blaming the Sentencing Commission for

10  designating him a career offender.  Well, as I said before,

11  he's a career offender regardless.

12         He's suggesting that he didn't have appropriate

13  guidance as a youth.  He had plenty of opportunity.  He had

14  counselors.  He had therapists.  He had probation officers all

15  available to him.  He had family.  All of that was available to

16  Mr. Jackson.  He availed himself of none of it, or he didn't

17  listen to it and just continued down the path that he had

18  started.

19         I know he has a young child, and his young child is

20  not going to get to see him for some time regardless of what

21  the Court orders here.  But as the Court has heard, Mr. Smith

22  has young children too, and they don't -- they don't get to

23  visit, they don't get to call because Gerald is gone.  He's

24  gone because of what Mr. Jackson did, nobody else.

25         So, Your Honor, we think that based on the history of

1    violent behavior engaged in by Mr. Jackson and the instant

2    offense conduct, an appropriate sentence is as Mr. Eckiss,

3    Billie Eckiss, said, 50 years to life.  I think that's clearly

4    appropriate under these circumstances, and I would ask the

5    Court to impose it.

6              THE COURT:  Thank you.  Ms. Strong.

7              MS. STRONG:  Thank you, Your Honor.  Your Honor, we

8    leave the actual term of years to your wise discretion.  As the

9    Court knows, as opposing counsel knows, we think that there are

10   a variety of reasons for a Court to vary from the 36 --

11   360 months to life sentence that is the guideline sentence

12   here.  Your Honor is well aware of the parsimony clause and the

13   need to fulfill the particular sentencing purposes, and I would

14   suggest specifically, Your Honor, that a 50-year sentence I

15   think is excessive in terms of those particular criteria.

16              Your Honor, we're not trying to reject the jury

17   verdict.  The jury decided, and they decided this was not a

18   perfect self-defense case, but there still are aspects of

19   imperfect self-defense that I will not go over again.  I have

20   gone over those in the Sentencing Memorandum.  We have provided

21   select exhibits and things that are outside of the court record

22   for the Court to consider because there is a specific

23   sentencing guideline entitled victim's conduct, and I have

24   argued that also, that is pertinent to whether or not the Court

25   decides to grant a variance, and if so, to the amount of the

1    variance that is to be granted here.

2           The history between the two families is unfortunate,

3    but it exists.  And I think that backdrop, given the ages of

4    both the victim and my client, are important for the Court to

5    have, painful to hear, dramatic, but something that is, I

6    think, important in this case.

7           The other thing that did happen with the jury that I

8    think is perhaps a clue, but is something of significance is

9    they did send out a note, and they had some questions,

10   apparently, about the three elements of heat of passion, which

11   at least indicated that they were thinking of it.  Again, we're

12   not saying that they came to a wrong decision, whatever.  That

13   is simply a significant circumstance, as is the fact that my

14   client did all along in plea negotiations indicate that he

15   would plead guilty to a lesser charge of voluntary

16   manslaughter.

17          And the value in that, Your Honor, is not to, of

18   course, disrespect the U.S. Attorney and the judgments they

19   made, but simply to point out this, that at points my client

20   was willing to accept responsibility if there was the

21   possibility for a lesser charge.  We understand that did not

22   occur.  We had a trial, and he was convicted of second degree

23   homicide.

24          Your Honor, I don't think this is the kind of case --

25   looking at the facts of the case, the government always wants

41

1    to cast it in terms of a cold-blooded, preplanned, premeditated

2    murder.  I don't think that it sounds that way.  I don't think

3    that the evidence at trial clearly makes that an indisputable

4    view of this type of case.  It doesn't make sense for somebody

5    like my client to plan something and then commit a cold-blooded

6    murder in an open road in front of a relative and a number of

7    motorists and people he knew and he did not know.  So I think

8    that fact does not support the longer sentence that the

9    government is seeking.

10          Turning to my client's criminal history, it is not a

11   good history.  I know the Court is well familiar with my

12   client.  You have sentenced him before, but in terms of it

13   being the continually escalating crimes of violence that

14   Mr. Volk would like it to be, that's just not so.  I think the

15   worst assaultive -- the only other assault that my client has

16   committed that he's been convicted of is the North Dakota crime

17   of violence, and that actually is a little dated at this time.

18   It's very significant.

19          He does have assaultive conduct while he has been

20   incarcerated both in the North Dakota system, pretrial, but to

21   his credit, Your Honor, since he has been indicted on this

22   charge and has been incarcerated in a variety of facilities,

23   apart from the incident with Mr. Freeman, he basically has had

24   clear conduct.  And that is something that I think in terms of

25   sentencing says that he can conform his conduct to

1    institutional rules.

2            As far as him being antisocial and someone who we

3    need to lock up and throw away the key, antisocial, those are

4    diagnoses that can be thrown around.  We don't really have a

5    recent diagnosis of that, and I would ask the Court to

6    disregard that and not make that a primary reason in terms of

7    your sentence here.

8            Your Honor, I know that you will say, and I think

9    these things are all justifiable, that he had the ability not

10   to stop that day, he had the ability to walk away from Gerald

11   Smith.  Those things are all true.  There's nothing that my

12   client can change at this point.  But one of the big

13   roadblocks, I think, to any hope for Terrance Jackson is drug

14   addiction.  And he obviously now is clean and sober because he

15   has to be because locking somebody up does that.

16           But as far as life opportunities that the government

17   points out he had, I don't think he had all those

18   opportunities.  I think his life growing up on the reservation

19   was fairly tough.  He grew up without a dad.  As you can tell

20   from his mother's testimony and her letter, she's done the best

21   that she could.  And even though he has a strong family support

22   network, most of the research and all of what we know

23   anecdotally about family structure says that in particular for

24   a young man to not know your father, to not have a father's

25   guidance -- and we don't have anybody here, frankly, who has

43

1    testified or has stepped in or ever did step into the paternal

2    role for Terrance Jackson, and that's very significant, Your

3    Honor.

4           Your Honor, I think there is hope for Mr. Jackson.

5    Some of the things that I presented in the sentencing memo were

6    meant to be thought-provoking because of the very serious

7    nature of the sentencing and of our current prison systems and

8    because I do genuinely and anecdotally think that in terms of

9    Terrance Jackson's prior assaultive conduct, that he may be,

10    although I don't know for certain, a creature of the

11    environment that he was put into as a young man, a man who

12    would go into prison.  It's a world unto itself.  It's a

13    community, and many of our prisons, state and federal, are

14    places that breed violence, quite frankly.  I would hope that

15    this time around, because he is going to be doing a significant

16    sentence, that he will get to a better place within the Bureau

17    of Prisons.

18           He's a very intelligent young man, and he is a person

19    who ironically, as his victim, Gerald Smith, has a young child.

20    Despite their life's hardship and the criminal conduct, they

21    have families who care about them and continue to care deeply

22    for him.

23           The one advantage that we could say about a long term

24    in prison, Your Honor, is that there are people who go in for

25    homicides and they are able to transform their lives.  I don't

1    think we need to give him a 50-year sentence.  He's 25 now.  He

2    would be -- with the 85 percent, of course, he would be a very,

3    very old man.  Anecdotally speaking and statistically speaking,

4    males generally slow down in terms of violent, assaultive

5    conduct in their forties.  People who do death penalty work,

6    that's what those type of statistics tell us.

7            So I would respectfully suggest to the Court that,

8    again, the 50-year to life sentence, while it may make the

9    Smith family feel better temporarily, we know it's not going to

10   bring Gerald back.  We know that it's an important thing

11   symbolically for the family.  It's also important to society.

12   Terrance needs to be punished for this particular crime and for

13   the life that he took.

14           But I think there is hope for Terrance, and I think

15   he is an individual for whom rehabilitation is not a lost

16   cause, and we would ask the Court, finally speaking, to, of

17   course, take all of these things into account.  Thank you.

18           THE COURT:  Thank you.  Mr. Jackson, I'm required

19   under the rules to give you an opportunity to speak at this

20   hearing, and you're free to speak at this time, comment on any

21   aspect of this case, as well as the subject of sentencing.

22           THE DEFENDANT:  I have nothing, Your Honor.

23           THE COURT:  Okay.  Nothing at all?

24           THE DEFENDANT:  No, sir.

25           THE COURT:  All right.  Well, I've reviewed the

45

1    Presentence Investigation Report and the other materials that I

2    previously identified.  All of the information contained in the

3    Presentence Investigation Report is incorporated by reference

4    into my Judgment.  We're dealing with an offense level of 38, a

5    criminal history category of VI, which is as bad as it gets in

6    the federal criminal justice system.  We don't have any higher

7    criminal history categories than Criminal History Category VI.

8    The advisory guideline range is 360 months to life.  Nobody has

9    disputed those guideline calculations.

10              I went back before today and not only reviewed my

11   trial notes, but I reviewed the Presentence Investigation

12   Report from when I sentenced you back in July of 2011 on a

13   burglary charge.  And I looked at the transcript from that

14   hearing as well, again, back to July of 2011.  Here's what you

15   told me in the handwritten statement dated June 29, 2011.

16              You said one facing a burglary sentence, that you had

17   taken time to better yourself and look at what you want in

18   life, and today you -- at that time you felt more mature and

19   thinking a lot clearly than I was when I first got arrested.  I

20   didn't realize what I was doing until I got arrested, and now I

21   want to move on in life and grow up and be a father.  You said

22   to me that if you gave me leniency, it would really help me

23   because I'm already serving time, and I would be able to get

24   out earlier and start being a father and a better role model to

25   my siblings.

1            You went on to tell me that if I gave you leniency at

2    that time on the burglary charge, that you would respect the

3    law much more than you already do, that you plan on staying out

4    of trouble and obeying the law.  You went on to tell me that

5    you were done doing the childish things that you had done in

6    that case.  You said to me, quote, "I don't plan on committing

7    any more crimes in the near future, and I want to live an

8    honest life from here on.  I plan on being a good father, live

9    an honest life, obey my probation because I'm not a kid

10   anymore, and it's time to grow up.  Please take this into

11   consideration.  Thank you.  Sincerely, Terrance Jackson."

12           Then I went back and looked at the transcript from

13   the sentencing hearing, and at that time I sentenced you, I

14   believe, to the low end of the sentencing guidelines.  I think

15   it was somewhere in the range of 30 months on a burglary

16   conviction, and here's what I said to you at the sentencing

17   hearing on July 18, 2011.

18           I said, "I do hope that you can get a handle on

19   drinking and your use of street drugs.  I believe that you need

20   help in that regard.  I also feel that if you don't get help,

21   you're probably going to end up in one of several scenarios.

22   You will either be, one, seriously injured or killed in some

23   senseless, mindless brawl over nothing; or, two, you will kill

24   someone or seriously injure someone, all done while you or

25   others are intoxicated or high on street drugs, and then you'll

1    end up back in federal prison for a long time."

2           I said, "I hope I don't see you again in federal

3    court.  I don't find any great joy in seeing a 20-year-old

4    guy," which is what you were at the time, "with a young child

5    having to go off and serve time in federal prison.  I would

6    just as soon see you out living on the outside and working and

7    living and have -- living a law-abiding lifestyle and enjoying

8    life."

9           I then went on and told you in the next paragraph

10   that, "If you end up in federal court again, I believe from my

11   review of the Presentence Report, that you will have had at

12   least two crimes of violence.  The Eighth Circuit Court of

13   Appeals has said that burglary is a crime of violence.  You've

14   got a terrorizing charge and an assault charge in state court.

15   If you end up with three crimes of violence, then you're

16   considered what's called a career offender in the federal

17   criminal justice system.

18          "And if you're determined to be a career offender

19   after being convicted of another crime of violence, then you

20   begin to look at some extremely long sentences in the federal

21   criminal justice system.  The sentences are generally much

22   longer than what they are for persons that are not considered

23   to be career offenders."

24          And I said to you that, "You need to get a handle on

25   how you conduct your life, and hopefully you will choose to

1    live a life that's free of the excessive use of alcohol and the

2    use of any street drugs.  I hope that you choose to live a

3    law-abiding lifestyle and have a good life, rather than one

4    spent in a prison cell."  That's what I told you on July 18,

5    2011, and here we are.

6            And I looked through my trial notes, and, I mean,

7    it's just another completely mindless, senseless act of

8    violence over what?  Long-standing family disputes,

9    long-standing disputes between some young kids, but what does

10   anybody gain from arguing and fighting and squabbling and

11   bickering over the most meaningless, senseless of things?  It

12   just tears your life apart, the Smith family's life apart, your

13   -- the Jackson family's life apart.  It's beyond incredible

14   that we're sitting here after I sentenced you in July of 2011.

15           There's been no requests for any traditional downward

16   departures from the guidelines, so I don't have to address that

17   in accordance with Eighth Circuit case law.

18           There has been a request for a variance from the

19   guidelines, and it's clear from the Eighth Circuit that every

20   judge has to address that subject matter as well.  And in doing

21   so, I am required to give consideration to sentencing factors

22   set forth in 18 United States Code, Section 3553(a).  There's

23   10 or 11 sentencing factors outlined in that statute.  I'm well

24   aware of that statute.  I've sentenced thousands of defendants.

25   I've considered 3553(a) factors in every one of those cases,

1    and I've done so in this case.

2         And the Eighth Circuit Court of Appeals has made it

3    crystal clear to sentencing judges in this Circuit that in

4    addressing the 3553(a) factors, we are entitled to rely upon

5    undisputed factual information contained in the Presentence

6    Report, which I do.  We are also entitled to rely upon

7    information contained in sentencing memorandums, letters of

8    support, exhibits submitted as attachments to sentencing

9    memorandums.

10        We're entitled to rely upon arguments of counsel.

11   I'm entitled to rely upon my recollection of the testimony

12   presented at the trial of this matter.  And I rely upon all of

13   those matters.  But in the broad exercise of my discretion, I

14   would not impose a variance in this case.  I would not even

15   consider a departure.  There was a life taken in this case over

16   what?

17        You might have hated Mr. Smith, but all you had to do

18   was drive by that day when you saw him in the ditch, flip him

19   the bird and keep driving, you know, move on with your life.

20   You didn't have to stop in the ditch, jump out of the vehicle,

21   throw your hat off and go confront him.  And I understand he

22   threw the first punch, but you brought a knife to a fist fight,

23   and it's not a fair fight.  He didn't have any weapons on him.

24   He did not have brass knuckles.  He did not have any weapons on

25   him, and I listened to that evidence carefully about what was

1    found at the scene of the crime.

2         Pursuant to the Sentencing Reform Act of 1984, it's

3    going to be my judgment, Mr. Jackson, that you shall be

4    committed to the custody of the Bureau of Prisons to be

5    imprisoned for a period of 480 months on Count 1 and 120 months

6    on Count 2, to run concurrent with one another.  That's 40

7    years in federal prison.  It's not a life sentence, which is

8    what the government recommended, but -- and I don't think that

9    the government's recommendation is necessarily unreasonable.

10        But I also like to try to bring some common sense to

11   every case, and I don't take these cases lightly.  I don't take

12   sentences in second degree murder cases lightly.  But you've

13   demonstrated that you can't function very well in society

14   without hurting people, so you need to go away for a long time.

15   You've earned that ticket.

16        After release from prison I'm putting you on

17   supervised release for a period of ten years -- oh, I'm sorry,

18   five years, five years on Count 1, three years on Count 2, to

19   run concurrent with one another.  I'm ordering restitution in

20   the amount of $9,895.  I'm ordering that you pay a special

21   assessment of $200.  I'm not ordering a fine in this case.

22        And in terms of the conditions of supervised release

23   that will follow you after you're released from custody, they

24   are as follows:  You'll be required to comply with standard

25   conditions of supervision, and I've sat here in July of 2011,

1    read these to you just the way I'm reading them to you now.

2    You're prohibited from violating any laws.  If you violate any

3    laws, including tribal laws, you're back in court again.

4          You're prohibited from using street drugs,

5    associating with people that use street drugs, associating with

6    convicted felons.  You're barred for life from possessing

7    firearms or ammunition, and you'll be assigned a probation

8    officer that you'll be required to report to whenever they

9    request that of you.

10          With respect to special conditions, they're really

11    not any different than what I ordered back in July of 2011.

12    I'm ordering that you take part in a drug-alcohol treatment

13    program, that you abstain from the use of alcohol and street

14    drugs, including inhalants and synthetic drugs.  You'll be

15    subject to random drug and alcohol testing.  I'm prohibiting

16    you from ever entering a bar again while you're on supervised

17    release.

18          You'll be required to take part in any other form of

19    programming or counseling deemed appropriate by the U.S.

20    Probation Office, which could include such things as treatment

21    and programming for anger management, cognitive skills,

22    parenting skills, family skills.

23          I'm ordering that you shall not have any contact with

24    the victim's family, directly or indirectly or through any

25    means whatsoever, whether it's electronic, in person, e-mail,

1    mail, U.S. mail or any other sources.

2          And you'll also be subject to a search clause while

3    you're on supervised release, as is everybody in the federal

4    criminal justice system.

5          Any questions about those conditions of supervision?

6          MS. STRONG:  No, Your Honor.

7          THE COURT:  I didn't expect that you'd say much here

8    today, Mr. Jackson, but I did expect something like, "I'm

9    sorry.  I did wrong.  I apologize to the family.  I take

10   responsibility for my misdeeds.  I'm sorry for all of the pain

11   and anguish that I've caused the Smith family, my own family

12   and others."  It doesn't take much to just say you're sorry.

13   Even if you're not a talkative person, it doesn't take anything

14   to say I'm sorry.  But I run into defendants from all walks of

15   life, some of whom never express an ounce of remorse, and

16   there's not much I can do about that.

17          I do need to inform you, sir, that you do have a

18   right to appeal.  In this case you have a right to appeal the

19   decision of the jury finding you guilty of second degree murder

20   within Indian country.  You have a right to appeal the sentence

21   that I've ordered you to serve, as well as any of the

22   conditions of supervised release.

23          The time period to appeal in the federal system is

24   extremely short.  It's 14 days.  I probably won't sign the

25   Judgment today.  I'll probably sign the paperwork, which is

1  called the Judgment or the Judgment of Conviction, tomorrow

2  morning.  When I sign that, it gets electronically filed, and

3  that's what triggers the start of the time period to appeal.

4  So when I sign the paperwork tomorrow morning, you'll have 14

5  days from tomorrow to file an appeal from the decision of the

6  jury, as well as the sentence that I've ordered here today.

7          All that you need to do if you wish to appeal is talk

8  to Ms. Strong and tell her that that's what you want to do.

9  And all that she needs to do is prepare a one-paragraph,

10  one-page document called a notice of appeal, and that protects

11  your appeal rights.  If there's no appeal filed within 14 days,

12  however, you have lost that right to appeal.  Do you have any

13  questions about your right to appeal and when that needs to be

14  taken?

15          THE DEFENDANT:  No.

16          THE COURT:  With respect to the appeal concerning the

17  trial, I gave the jury all the instructions that everybody

18  asked for, including a verdict form that included the

19  lesser-included offenses.  I gave both attorneys an opportunity

20  to argue until they are blue in the face about what the verdict

21  should be and how the evidence supported or did not support a

22  lesser-included charge.  I think the jury heard all the

23  evidence.

24          And in terms of who the jury believed or they didn't

25  believe, generally on appeal, Courts of Appeals universally say

1   that credibility issues, the believability of witnesses is left

2   for juries to decide, not appellate courts.

3         With respect to the sentence, I sentenced you in

4   accordance with the sentencing guidelines.  Every Court of

5   Appeals that I'm aware of in this country has universally said

6   that as long as a defendant is sentenced in accordance with the

7   sentencing guidelines, for appeal purposes, that's presumed to

8   be a reasonable sentence.  I've been here since 2002.  I've

9   never had a defendant whom I have sentenced in accordance with

10  the sentencing guidelines that's ever been successful in

11  challenging one of my sentences.  But if you wish to appeal, I

12  don't hold it against you.

13        You can appeal and pursue all of those arguments to

14  the Eighth Circuit Court of Appeals.  And there will be three

15  judges there that would listen to the arguments of the

16  attorneys and review the transcript from the trial and make a

17  decision.  But I think in this case it's going to be difficult

18  to overturn what a jury heard when they heard and weighed and

19  considered all of the evidence.

20        It's just a sad case.  No matter which way you look

21  at it, no matter what side of the fence you're on, it's a sad,

22  sad case.

23        Mr. Volk, do you have any objections that you wish to

24  note to the sentence that's been imposed here this afternoon or

25  any of the conditions of supervised release?

55

1          MR. VOLK:  No, Your Honor.

2          THE COURT:  Ms. Strong?

3          MS. STRONG:  Your Honor, we do object to the Court's

4   sentence, respectfully, as excessive, cruel and unusual

5   punishment in violation of the Eighth Amendment of the United

6   States Constitution.

7          THE COURT:  Any objection to the conditions of

8   supervised release?

9          MS. STRONG:  No, Your Honor.

10         THE COURT:  All right.  Any questions, Mr. Jackson?

11         THE DEFENDANT:  No, sir.

12         THE COURT:  I wish you would have got my message in

13  July of 2011.  I always thought that you were a smart enough

14  guy that you would have latched onto things and moved on with

15  your life in a positive fashion, but I'll leave it at that.

16         We are adjourned.

17         (Proceedings concluded at 4:02 p.m., the same day.)

18                    - - - - - - - - - -

19

20

21

22

23

24

25

1                    <u>CERTIFICATE OF COURT REPORTER</u>

2          I, Sandra E. Ehrmantraut, a Certified Realtime

3    Reporter,

4          DO HEREBY CERTIFY that I recorded in shorthand the

5    foregoing proceedings had and made of record at the time and

6    place hereinbefore indicated.

7          I DO HEREBY FURTHER CERTIFY that the foregoing

8    typewritten pages contain an accurate transcript of my

9    shorthand notes then and there taken.

10         Dated:  August 11, 2016

11

12                         <u>/s/ Sandra E. Ehrmantraut</u>
                           Certified Realtime Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

                              57